IN THE SUPREME COURT OF MISSISSIPPI

NO. 2008-CA-01642-SCT

*VICKI WORTHY AND FRED WORTHY,
INDIVIDUALLY AND AS WRONGFUL DEATH
BENEFICIARIES OF MACKENZY WORTHY,
DECEASED*

*v.*

*ROBBYE D. McNAIR, M.D., WOMEN'S CLINIC
OF GREENWOOD, P.A.*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/30/2008 |
| TRIAL JUDGE: | HON. RICHARD A. SMITH |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | ELLIS TURNAGE |
| ATTORNEY FOR APPELLEES: | TOMMIE GREGORY WILLIAMS, JR |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 06/10/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1.     The plaintiffs, Vicki and Fred Worthy, brought this medical-malpractice and wrongful-death action against the defendants, Dr. Robbye D. McNair and the Women's Clinic of Greenwood, alleging that their unborn child died as a result of Dr. McNair's negligent provision of prenatal care. The defendants, through a **_Daubert_**[1] motion, argued that the obstetrician-gynecologist whom plaintiffs have offered as an expert is unable to provide

---

[1] **_Daubert v. Merrill Dow Pharmaceuticals, Inc._**, 509 U.S. 579 , 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

reliable testimony regarding the cause of the baby's death. The trial court agreed that the challenged testimony is unreliable and thus inadmissible, basing its ruling primarily on the following facts: the expert is not a pathologist; the expert did not study the placental tissues of the baby under a microscope; and the plaintiffs offered as an expert witness, in addition to the obstetrician-gynecologist, a pathologist who gave an opinion different from the obstetrician-gynecologist's. The trial court also found that, without the obstetrician-gynecologist's testimony regarding cause of death, the plaintiffs had no expert to link the alleged breach of the standard of care to the baby's death, and therefore, summary judgment and a directed verdict were warranted.

¶2.     The plaintiffs appealed to this Court, arguing that: 1) the trial court abused its discretion in excluding the obstetrician-gynecologist's testimony as to cause of death, and 2) the trial court committed reversible procedural error by issuing an order "granting summary judgment and directed verdict" after a jury had been empaneled. Finding that the trial court committed no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶3.     On October 7, 1999, plaintiff Vicki Worthy visited the Women's Clinic of Greenwood, where she met with defendant Dr. McNair, an obstetrician, who confirmed that she was pregnant. Dr. McNair and the Women's Clinic provided prenatal care to Worthy throughout her pregnancy. On May 23, 2000, Worthy visited Dr. McNair's office, reporting that she had experienced decreased fetal movement since the previous evening. Tests performed that day determined that the fetus had died, and Dr. McNair delivered the stillborn baby via cesarean section.

2

¶4.    Dr. Michael Montes, a local pathologist, performed an autopsy on the baby.  The

"microscopic diagnosis" included in the autopsy report stated, among other things:

> - Slightly immature placenta with increased syncytial knotting of chorionic villi
> consistent with fetoplacental insufficiency.
> . . .
> - Fetal hydrops with associated hepatomegaly and cardiomegaly
> - Oligohydramnios

The "discussion" included at the end of the autopsy report stated:

> . . . The two main findings were: 1. Hydrops fetalis and 2. Oligohydramnios
> gross features.
>
> The list of disorders associated with hydrops fetalis is extensive . . . .
>
> Oligohydramnios (decreased amniotic fluid) may be caused by a variety of
> unrelated maternal, placental, or fetal abnormalities.  The features of
> fetoplacental insufficiency in the placenta could certainly have contributed [*sic*]
> fetal placental insufficiency which in turn has a host of etiologies.  Chronic
> leakage of amniotic fluid due to rupture of amnion, uteroplacental insufficiency
> from maternal hypertension or severe toxemia, and [*sic*] are all causes of
> oligohydramnios.   The fetal compression associated with significant
> oligohydramnios in turn results in the phenotype observed in this fetus.  That
> is, flattened faces, malpositioned limbs, and thickened skin membranes.
> Clinical correlation is suggested.

Thus, the autopsy report stated that the autopsy revealed conditions consistent with placental

insufficiency, but suggested that it could not be concluded, one way or the other, whether the

fetus died from placental insufficiency.   Dr. McNair explained at her deposition that the

phrase "clinical correlation" in Dr. Montes's autopsy reports "usually means he doesn't have

enough information from the findings to say exactly what the cause was . . . it means . . . how

well does this correlate with the clinical scenario to determine what the etiology was."

¶5.    On May 23, 2002, Worthy and her husband, Fred Worthy, brought suit against Dr.

McNair and the Women's Clinic, alleging that the defendants were negligent, and that their

3

negligence had led to the death of the Worthys' unborn child. The plaintiffs selected Dr. Bruce Halbridge, an obstetrician-gynecologist, and Dr. Carole Vogler, a pediatric pathologist, to testify as expert witnesses. Prior to trial, the plaintiffs took the evidentiary depositions of both experts for use at trial.

¶6. On April 29, 2008, the matter proceeded to trial and a jury was selected, duly sworn, and empaneled. After the jury was dismissed for the day and instructed to return the next morning, the trial court took up the defendants' *Daubert* motion. The motion challenged the reliability of Dr. Halbridge's testimony regarding the baby's cause of death.

*Dr. Halbridge's Testimony*

¶7. At his deposition, Dr. Halbridge testified that Dr. McNair had been negligent in the care of Worthy. Dr. Halbridge testified that Dr. McNair had failed to diagnose Worthy with gestational diabetes and chronic hypertension. He proceeded to testify that an obstetrician caring for a pregnant woman with these conditions is required to initiate a program of testing referred to as antenatal surveillance. This consists of non-stress tests, contraction stress tests and/or biophysical profiles – all of which are methods of testing for fetal well-being. Dr. Halbridge testified that, had this program of testing been carried out, Dr. McNair would have learned that placental insufficiency complicated the pregnancy. Dr. McNair would have then delivered the fetus earlier, resulting in the delivery of a live baby. In sum, Dr. Halbridge testified that Dr. McNair had breached the applicable standard of care by failing to diagnose Worthy with gestational diabetes and chronic hypertension, and thus failing to initiate the appropriate program of testing.

4

¶8.     Dr. Halbridge also testified  regarding the cause of the baby's death – linking the alleged breach of the standard of care to the baby's death.  He unequivocally testified that the hydrops,[2] or diffuse swelling of the tissues, was due to placental insufficiency.  He explained that the maternal diabetes and chronic hypertension resulted in placental insufficiency, which led to the hydrops, and ultimately led to the baby's death.

*Dr. Vogler's Testimony*

¶9.     Dr. Vogler, the pathologist whom the plaintiffs selected as an expert witness, testified that the cause of the hydrops, and thus the baby's death, was unknown.  Dr. Vogler testified that there was no evidence of placental insufficiency.  She based her determination on her experience as a pathologist, her review of Worthy's medical records and the autopsy report, and her study of the Worthy baby's placental tissues under a microscope.

¶10.    The trial court concluded that Dr. Halbridge's testimony as to cause of death, though relevant, was not reliable and did not meet the criteria required by Rule 702 of the Mississippi Rules of Evidence and ***Daubert***, 509 U.S. 579 , 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The trial court held that Dr. Halbridge's background in obstetrics, along with his review of Worthy's medical records and the autopsy report, were sufficient to deem his testimony regarding standard of care reliable.  However, the trial court ruled that his background and review of the records was not sufficient to deem his testimony reliable as to cause of death. The trial court found that Dr. Halbridge's testimony failed to establish his expertise as a pathologist, nor did he presented any literature or scientific evidence that supported his opinion as to cause of death.   Further, the trial court found that the issue of placental

_____

[2]All of the deposed experts agreed hydrops ultimately caused the baby's death.

5

insufficiency as the cause of death fell within the speciality of pathology, not obstetrics. The trial court then reasoned that, since the autopsy report did not establish placental insufficiency as the cause of death, and since the plaintiffs' own expert in pathology found no evidence of placental insufficiency, Dr. Halbridge's testimony that placental insufficiency was the cause of death was unreliable.

¶11.  The trial court orally announced at trial that it was granting the defendants' motion to exclude Dr. Halbridge's testimony as to causation. The trial court reasoned that, without Dr. Halbridge's testimony, the plaintiffs lacked an expert to testify as to causation (i.e., an expert to link the alleged breach of the standard of care to the harm – in this case, hydrops and death) which is needed to establish negligence.  Subsequently, the court prepared a written order excluding Dr. Halbridge's testimony as to causation, and also an order "granting summary judgment and directed verdict." The plaintiffs timely appealed to this Court.

### DISCUSSION

¶12.  The Worthys raises the following two issues on appeal:

**I.    Whether the trial court erred in finding Dr. Halbridge's testimony to be unreliable and, therefore, inadmissible under Mississippi Rule of Evidence 702 and *Daubert,* 509 U.S. 579.**

**II.   Whether the trial court erred by dismissing the action after a jury had been empaneled.**

### I.

¶13.  A trial court's admission or exclusion of expert testimony is reviewed for abuse of discretion. ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31 (Miss. 2003).  The trial

court's decision will stand unless the reviewing court concludes that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion. *Id.*

¶14. In *Mississippi Transportation Commission v. McLemore*, this Court adopted the "*Daubert/Kumho*" rule – the Supreme Court of the United States' standard as set forth in *Daubert*, 509 U.S. 579, and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) – as the standard for assessing the reliability and admissibility of expert testimony. *McLemore*, 863 So. 2d at 35. Of primary importance in assessing the admissibility of expert testimony is Rule 702 of the Mississippi Rules of Evidence, which is currently identical to Rule 702 of the Federal Rules of Evidence. It states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702.

¶15. Summarizing *Daubert* and *Kumho*, the *McLemore* Court explained the following: "the liberal goals of the [rules] include reducing the traditional barriers to opinion testimony." *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 588-89). *See also Poole v. Avara*, 908 So. 2d 716, 722 (Miss. 2005) ("The [U.S. Supreme] Court emphasized the liberal thrust of the rules and the general approach of the rules to relax the traditional barriers to opinion testimony."). However, trial courts retain authority to review scientific evidence to determine

7

admissibility: the authorities are clear that it is the trial court that is vested with the "gatekeeping responsibility." *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 589).[3]

¶16.    The trial court must engage in a two-pronged inquiry, determining whether the expert testimony rests on a *reliable* foundation and is *relevant* to the matter. *Id.* Regarding the "reliability" prong – which is at issue in the present case – the testimony must be grounded in the methods and procedures of science, not merely a subjective belief or unsupported speculation. *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 590).[4] As Rule 702

---

[3]*See Daubert*, 509 U.S. at 589 ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); *Id.* at 595 ("The [trial] judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."); *Id.* at 597 ("[T]he Rules of Evidence – especially Rule 702 – do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."); *Kumho Tire Co.*, 526 U.S. 137 ("[W]here [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline."); *Id.* at 158 ("Rule 702, grants the [trial] judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case."); *Poole v. Avara*, 908 So. 2d 716, 723 (Miss. 2005) ("[T]he trial judge is to act as a gatekeeper, ensuring that expert testimony is both relevant and reliable."); *Miss. Trans. Comm. v. McLemore*, 863 So. 2d 31, 40 (Miss. 2004) ("We are confident that our learned trial judges can and will properly assume the role as gatekeeper on questions of admissibility of expert testimony."); *Sheffield v. Goodwin,* 740 So. 2d 854, 856 (Miss. 1999) ("A trial judge's determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion."); *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 146 (Miss. 2007) ("A trial judge's decision as to whether a witness is qualified to testify as an expert is given the widest possible discretion.").

[4]Analyzing the language of Rule 702 and the *Daubert* opinion, the *Kumho Tire* Court concluded that a trial court's gatekeeping responsibility applies to the admissibility of expert testimony based not only on "scientific" knowledge, but also on "technical" and "other specialized knowledge." *McLemore*, 863 So. 2d at 37 (citing *Kumho Tire*, 526 U.S. at 151).

states, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods." Miss. R. Evid. 702.

¶17. The *Daubert* Court adopted a nonexhaustive, illustrative list of reliability factors for determining the admissibility of expert testimony. *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 592-94). The factors include: whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *McLemore*, 863 So. 2d at 37 (citing *Daubert*, 509 U.S. at 592-94). The applicability of these factors varies depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony. *McLemore*, 863 So. 2d at 37 (citing *Kumho Tire*, 526 U.S. at 151). The analysis of expert testimony's admissibility is a flexible one that must focus on the principles and methodology applied, not on the conclusions they generate. *McLemore*, 863 So. 2d at 37; *Daubert*, 509 U.S. at 595.

¶18. The *McLemore* Court emphasized that "the trial court's role as gatekeeper is not intended as a replacement for the adversary system" when the expert's testimony is both relevant and reliable. *McLemore*, 863 So. 2d at 39. "Vigorous cross-examination, presentations of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky *but admissible* evidence." *McLemore*, 863 So. 2d at 36 (quoting *Daubert*, 509 U.S. at 595-96) (emphasis added).

9

¶19. Furthermore, to be admissible, the expert's opinion need not be based on first-hand knowledge. This Court has said, "[l]ike the Federal Rules, our rules grant wide latitude for experts to give opinions even when opinions are not based on the expert's firsthand knowledge or observations." *Id.* Rule 703 of the Mississippi Rules of Evidence provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing." Miss. R. Evid. 703. "[T]he fact that an expert witness did not examine [the person harmed] goes to the weight to be given the physician's testimony, not its admissibility." *McCaffrey v. Puckett*, 784 So. 2d 197, 203 (Miss. 2001).

¶20. This Court has long held that "[t]he general rule as to expert testimony in medical malpractice actions is that 'a specialist in a particular branch within a profession will not be required.'" *Causey v. Sanders*, 998 So. 2d 393, 403 (Miss. 2009) (quoting *Brown v. Mladineo*, 504 So. 2d 1201, 1202 (Miss. 1987)). "[I]t is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility." *Id.* See also *Sheffield v. Goodwin*, 740 So. 2d 854, 857 (Miss. 1999) (citing *Thompson v. Carter*, 518 So. 2d 609, 614 (Miss. 1987)); *Thompson*, 518 So. 2d at 614 ("A witness may qualify as an expert based on his knowledge, skill, experience, training, education or a combination thereof. Qualification as an expert does not necessarily rest upon the educational or professional degree a witness possesses.").

¶21. Dr. Halbridge's opinions regarding the cause of the baby's death are based on his experience as an obstetrician-gynecologist and his review of the medical records, autopsy report, and relevant medical literature. Dr. Halbridge is a clinician – not a pathologist – and

10

does not perform autopsies. He does, however, routinely review reports prepared by pathologists.

¶22. The autopsy report on which Dr. Halbridge rests his opinion in the present matter reached an inconclusive result. As previously stated, the report noted "[c]linical correlation is suggested," and Dr. McNair explained that clinical correlation "usually means that [the pathologist] doesn't have enough information from the findings to say exactly what the cause [of death] was."

¶23. In *Daubert*, the United States Supreme Court said:

> Unlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. . . . Presumably, this relaxation of the usual requirement of firsthand knowledge . . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of *his discipline.*

*Daubert*, 509 U.S. 579, 592 (emphasis added).[5] Further, while this Court has said "a specialist in a particular branch within a profession will not be required," we have gone on to say, "*[o]nly* if the witness possesses scientific, technical, or specialized knowledge on a *particular* topic will he qualify as an expert on *that* topic." *Sheffield v. Goodwin,* 740 So. 2d 854, 856 (Miss. 1999) (internal citations omitted) (emphasis added).

¶24. It is clear that trial judges are given great discretion in their gatekeeping authority under *Daubert*. We agree with the trial judge that Dr. Halbridge qualifies under the *Daubert/Kumho* standard to testify as to the standard of care. We further find that the trial

[5]Adopted by this Court in *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 39 (2003).

11

court did not abuse its discretion in finding that Dr. Halbridge's testimony was unreliable as to the cause of the baby's death. Such testimony would be outside *his discipline* or the *particular topic* in which he possessed scientific, technical, or specialized knowledge. Not only was Dr. Halbridge testifying outside his particular discipline, but the report on which he rested his opinion reached an inconclusive result.

¶25. The Worthys complain on appeal that "no evidence [was presented to the trial court] that Dr. Halbridge's opinions were not properly ground[ed] in scientific knowledge," and therefore, the trial court was in error for finding his testimony unreliable. However, Dr. Carole Vogler, a pediatric pathologist who also testified as an expert witness for the Worthys, directly contradicted the testimony of Dr. Halbridge as to the cause of the baby's death. Dr. Vogler testified that the cause of the baby's death was hydrops, but the cause of the hydrops was *unknown.* She also testified there was no evidence of placental insufficiency. Therefore, although Dr. Vogler's testimony was submitted by the plaintiffs rather than the defendants, sufficient evidence which contradicted the testimony of Dr. Halbridge was properly before the trial court when the court ruled on the defendant's ***Daubert*** motion.

¶26. Based on the foregoing analysis, the trial court did not abuse its discretion in finding Dr. Halbridge's testimony unreliable, and therefore inadmissible, under the ***Daubert*** standard.

**II.**

¶27. The plaintiffs also argue that the trial court erred in granting summary judgment after the jury was empaneled. The Worthys cite ***Hurst v. Southwest Mississippi Legal Services Corp.***, 610 So. 2d 374, 384 (Miss. 1992) (overruled on other grounds by ***Rains v. Gardner***, 731 So. 2d 1192 (Miss. 1999)), in support of their argument.

¶28. The *Hurst* Court stated, "commencement of trial closes the season for granting motions for summary judgment," and went on to say, "[w]here trial has already begun, it is far preferable to allow the plaintiff to present his case in chief and then, if the plaintiff has failed to meet his burden of proof, direct a verdict in favor of the defendant." *Hurst*, 610 So. 2d at 384.

¶29. The rationale in the *Hurst* opinion was based on the plaintiff's right to a trial by jury and concern for judicial economy, finding that the grant of summary judgment in that matter "served few, if any, of the pragmatic rationales for summary judgment." *Id*. This Court further stated that, under the facts in *Hurst*, "[t]he advance in judicial economy resulting from the trial court's grant of summary judgment was . . . minuscule at best."

¶30. However, it cannot be said that conducting a full trial in the present matter would serve the judicial economy or the interests of the litigants. Because the plaintiffs had no expert to testify as to causation, they could not prove the necessary elements of their negligence suit. Conducting a trial on the issue with full knowledge that the defendant must prevail as a matter of law – regardless of what a jury may determine – does not serve any of the purposes set forth in *Hurst*. Therefore, although a jury had been duly empaneled, the trial court was not in error for granting summary judgment in the present matter.

## CONCLUSION

¶31. The trial court did not abuse its discretion in determining that Dr. Halbridge's testimony regarding the cause of the infant's death was unreliable under *Daubert*, and therefore inadmissible under Mississippi Rule of Evidence 702. Because of the exclusion of Dr. Halbridge's testimony, the plaintiffs had no expert to testify as to causation in this present

13

matter. Furthermore, no purpose would have been served by holding a full trial in this matter, the defendants must prevail as a matter of law due to the lack of proof on the element of causation. Therefore, the trial court did not err in granting summary judgment. Accordingly, we affirm.

¶32. **AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND CHANDLER, JJ.**

**GRAVES, PRESIDING JUSTICE, DISSENTING:**

¶33. I disagree with the majority's finding that the trial court did not abuse its discretion in determining that Dr. Halbridge's testimony regarding the Worthy baby's cause of death was unreliable and thus inadmissible. I agree with the majority's summary of the law regarding admissibility of expert testimony, but I conclude that the law was not appropriately applied. Regarding the second issue – whether the trial court erred in granting summary judgment after the jury had been empaneled – I agree, for reasons different than those provided by the majority, that the trial court's granting of "summary judgment and directed verdict" does not constitute reversible procedural error; however, I disagree with the majority's finding that it was not error for the trial court to grant summary judgment in this matter. Therefore, I must dissent and would reverse and remand this case for a new trial in which Dr. Halbridge's testimony regarding the cause of the baby's death would be deemed reliable and admitted.

¶34. The majority provides a thorough summary of the law regarding the admissibility of expert testimony; however, I would add to its summary that "the most important question is

14

not whether one . . . expert is more qualified than the [other], but rather, whether an expert's testimony is reliable." **Huss v. Gayden**, 571 F. 3d 442, 455 (5th Cir. 2009). This Court has emphasized that when a proposed expert "'possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman[,]'" it is better that attacks on the expert's qualifications and methods be directed toward the weight of the testimony rather than its admissibility. **Hooten v. State**, 492 So. 2d 948, 948-49 (Miss. 1986) (quoting and citing **Henry v. State**, 484 So. 2d 1012 (Miss. 1986)). *See also* **McDonald v. Mem'l Hosp. at Gulfport**, 8 So. 3d 175, 183 (Miss. 2009) (Kitchens, J., concurring in part and dissenting in part) ("Rule 702 is broadly constructed and broadly construed. . . . It does not purport to restrict expert testimony to the domain of a tiny class of geniuses, but merely to differentiate between experts and laypersons. Rule 702 sets a 'low threshold for competency' in favor of courts' 'preference for leaving matters of credibility to the judgment of the jury . . . .' . . . Today, the national consensus remains broadly permissive of expert testimony; a party seeking to admit expert testimony need only demonstrate 'that the witness has sufficient skill or knowledge related to the pertinent field or calling that his inference will *probably* aid the trier in the search for truth.'" (internal citations omitted)). In other words, questions regarding which of two or more experts is most qualified should be left for the jurors to decide, based on their observation of the direct- and cross-examinations of the experts.

¶35. Applying the law laid out in the majority opinion and directly above, I conclude that the trial court abused its discretion in excluding Dr. Halbridge's testimony as to cause of death. As required by Rule 702 and **Daubert v. Merrill Dow Pharmaceuticals, Inc.**, 509 U.S.

579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), Dr. Halbridge's opinions were based on sufficient facts and grounded in science; his opinions were not merely subjective belief or unsupported speculation.

¶36. Dr. Halbridge is an experienced obstetrician-gynecologist who cares for women with high-risk pregnancies and is knowledgeable about placental pathology. He has been a board-certified obstetrician-gynecologist since 1978. He has cared for women with high-risk pregnancies for more than thirty-five years, managing thousands of such pregnancies throughout his years of practice. Dr. Halbridge had to become knowledgeable about obstetrical and gynecological pathology in order to become a board-certified obstetrician-gynecologist. Dr. Halbridge had to be trained in placental pathology to be able to care for his patients and understand what has happened to his patients' fetuses. On a weekly basis, he reviews reports of placental autopsies prepared by pathologists.

¶37. Dr. Halbridge based his opinions regarding the Worthy baby's cause of death on his experience as an obstetrician-gynecologist, his review of Worthy's medical records and the autopsy report, and his review of various medical textbooks and literature. He testified that the literature he referenced and provided at his deposition associates antepartum testing with pregnancy outcome; that the literature is reliable in the field of obstetrics-gynecology; that it is relied upon by obstetricians-gynecologists to form opinions and treat their patients; and that it is used as a teaching tool in medical schools throughout the country. Moreover, Dr. Halbridge testified that the diagnoses of gestational diabetes and placental insufficiency – the two conditions he believes caused the baby's death – are clinical, not pathological, diagnoses.

16

¶38. Given Dr. Halbridge's education, training, and experience, and his review of Worthy's medical records, the autopsy report, and relevant medical literature, it is evident that Dr. Halbridge's opinions as to cause of death are grounded in science and not merely a subjective belief or unsupported speculation. *See **Poole v. Avara***, 908 So. 2d 716, 723 (Miss. 2005) ("Scientific knowledge means something more than unsupported speculation or subjective belief that is grounded in methods and procedures of science. Certainly the witnesses' testimony here is not mere conjecture akin to astrology or something of the sort; the testimony is a medical opinion . . . ."). It is also evident that Dr. Halbridge – having reviewed Worthy's medical records, the autopsy report listing conditions "consistent with fetoplacental insufficiency,"[6] and medical literature associating antepartum testing with pregnancy outcome – based his opinions on sufficient facts.

¶39. Furthermore, experts can give opinions not based on firsthand knowledge or observation. ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 39 (Miss. 2003). Therefore, the fact that Dr. Halbridge based his opinions on review of Worthy's medical records and the autopsy report, as opposed to review of the placental tissues under the microscope, does not indicate that his opinions were unreliable.

¶40. In addition, in medical-malpractice actions, a specialist in a particular branch within a profession is not required; it is the expert's knowledge and experience, not his professional degree or title that governs the threshold question of admissibility. ***Causey v. Sanders***, 998 So. 2d 393, 403 (Miss. 2009); ***Sheffield v. Goodwin***, 740 So. 2d 854, 857 (Miss. 1999). *See*

---

[6] The case record suggests that the terms "placental insufficiency," "fetal placental insufficiency," and "fetoplacental insufficiency" have the same or similar meanings.

17

*also Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 146 (Miss. 2007) (where this Court found that a neurologist who was knowledgeable in the relevant area and who had treated patients similar to the plaintiff was qualified to offer opinions regarding the diagnosis and causes of the plaintiff's pneumonia, even though he was not a pulmonologist); *Bullock v. Lott*, 964 So. 2d 1119, 1123, 1127-29 (Miss. 2007) (where this Court found that the testimony of a family-practice physician was reliable as to standard of care, breach, and causation, despite the defendant's vigorous attack of the family-practice physician's qualifications during voir dire and cross-examination, and despite the contrary testimony of other expert witnesses. This Court rejected the defendant's assertion that the family-practice physician "was not qualified to render opinions solely within the purview of a neurosurgeon, radiologist or pathologist . . . ."). Thus, it is Dr. Halbridge's experience in managing high-risk pregnancies and his training in and knowledge of pathology that are relevant to the inquiry of "reliability," not the fact that he is an obstetrician-gynecologist as opposed to a pathologist.

¶41.    The majority is correct that "only if the witness possesses scientific, technical, or specialized knowledge on a particular topic will he qualify as an expert on that topic" (*Sheffield*, 740 So. 2d at 857); however, as explained above, Dr. Halbridge possesses scientific and specialized knowledge regarding high-risk pregnancies and placental pathology – the topic at issue.

¶42.    The determination of admissibility must focus on whether an expert's testimony is reliable, not on whether another available expert is more qualified. *Huss*, 571 F. 3d at 455. *See also McCaffrey v. Puckett*, 784 So. 2d 197, 203 (Miss. 2001) (where this Court, in finding that the testimony of a chiropractor as to cause of the plaintiff's injuries was reliable,

18

explained: "The fact that a medical doctor may be better qualified to render the same opinion does not preclude the chiropractor from testifying as an expert witness"). Relatedly, the adversary system – i.e., cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof – is the traditional and appropriate means of attacking the qualifications of an expert whose testimony meets the threshold reliability requirement. *McLemore*, 863 So. 2d at 36, 39.[7] *See also* *Causey*, 998 So. 2d at 403 ("'[W]hen there is a conflict of expert medical opinion, this Court has held it to be within the province of the fact-finder to determine the cause of death.'"). Thus, the question of whether Dr. Vogler, the plaintiffs' expert in pathology – or any other expert for that matter – was more qualified than Dr. Halbridge to testify regarding the cause of the baby's death is irrelevant. The trial court was in error to base its ruling in whole or in part on its determination that Dr. Vogler was more qualified than Dr. Halbridge to testify regarding cause of death. Vigorous cross-examination of Dr. Halbridge (during his deposition testimony) by defendants was the appropriate means of revealing to the jury any weaknesses or inadequacies in Dr. Halbridge's qualifications and opinions.

¶43. Lastly, the majority is in error to find that Dr. Halbridge's opinion is unreliable because "the [autopsy] report on which he rested his opinion reached an inconclusive result." Maj.

---

[7] If the trial court concludes that the evidence supporting a position is insufficient to allow a reasonable juror to conclude that the position is more likely true than not, the trial court can direct a judgment or grant summary judgment. *McLemore*, 863 So. 2d at 36 (citing *Daubert*, 509 U.S. at 596). These traditional devices, rather than the wholesale exclusion of the testimony, are the appropriate safeguards where the testimony meets the standards of Rule 702. *McLemore*, 863 So. 2d at 37; *Daubert*, 509 U.S. at 596. "Absent other grounds to exclude, an expert's testimony is presumptively admissible when relevant and reliable." *McLemore*, 863 So. 2d at 39.

Op. at ¶ 24. First, Dr. Halbridge did not "rest his opinion" on the autopsy report; rather, it was one of several sources of information upon which he based his opinion. Second, Dr. Halbridge was considering the report and its contents as a whole; i.e., he was considering the conditions listed in the report that the report describes as "consistent with fetoplacental insufficiency," not merely considering the final, inconclusive conclusion the author of the report reached. Needless to say, an expert can review and consider a report without adopting everything it says.

¶44. Therefore, I conclude that the trial court abused its discretion in finding Dr. Halbridge's testimony as to cause of death unreliable and inadmissible.

¶45. Regarding the second issue – whether the trial court erred in granting summary judgment after the jury had been empaneled – I agree, for reasons different than those provided by the majority, that the trial court's granting of "summary judgment and directed verdict" does not constitute reversible procedural error; however, I disagree with the majority's finding that it was not error for the trial court to grant summary judgment in this matter.

¶46. The jury for this matter was empaneled on April 29, 2008, then released, with instructions to return the following morning. On April 29, after the jury was released, the trial court heard the defendants' motion to exclude Dr. Halbridge's testimony as to cause of death. The next morning, the trial court granted the defendants' motion, stated that it would be granting summary judgment and/or directed verdict, and excused the jurors from the case. On September 4, 2008, the trial court filed orders with the clerk, granting the defendants'

motion to exclude Dr. Halbridge's testimony as to causation and "granting summary judgment and directed verdict."

¶47.   As the plaintiffs point out, ***Hurst v. Southwest Mississippi Legal Services Corporation*** states that summary judgment cannot be granted once the trial has begun (***Hurst v. Sw. Miss. Legal. Servs. Corp.***, 610 So. 2d 374, 384-85 (Miss. 1992) (*overruled on other grounds*)).[8] However, I conclude that the trial court's granting of "summary judgment and directed verdict" in the instant case does not constitute reversible procedural, error because, as the defendants point out, the rules of civil procedure discourage battles over mere form and encourage decisions on the merits rather than determinations based on technicalities. *See* Miss. R. Civ. P. 1 cmt.  It would be a waste of judicial resources for this Court to remand this case to the trial court, only to have the trial court restyle its order of dismissal as an order granting "directed verdict," as opposed to an order granting "summary judgment and directed verdict."

¶48.   Therefore, the trial court did not commit reversible procedural error by styling its order of dismissal as an order "granting summary judgment and directed verdict"; however, the trial court was in error to dismiss the case, because Dr. Halbridge's testimony as to cause of death was reliable, and thus the plaintiffs made out a prima facie case of medical negligence, which they should have been permitted to present to the jury.

---

[8] Notably, unlike in ***Hurst***, in the instant case, the jury, while having been empaneled, never heard opening arguments of either party.

¶49.    For the foregoing reasons, I must respectfully dissent and would reverse and remand this case for a new trial in which Dr. Halbridge's testimony regarding the cause of the baby's death would be deemed reliable and admitted.

**KITCHENS AND CHANDLER, JJ., JOIN THIS OPINION.**