# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01568-COA

**GERALDINE CHILDERS, AS PERSONAL REPRESENTATIVE OF PHILLIP CHILDERS, DECEASED**                                                        **APPELLANT**

**v.**

**ILLINOIS CENTRAL RAILROAD COMPANY**                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/23/2017 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PATRICK STEVEN O'BRIEN |
| | C.E. SOREY II |
| ATTORNEYS FOR APPELLEE: | STEPHANIE CAMILLE REIFERS |
| | THOMAS R. PETERS |
| | BROOKS E. KOSTAKIS |
| | JOHN JENNINGS BENNETT |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 06/11/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**TINDELL, J., FOR THE COURT:**

¶1.     Geraldine Childers (Childers) filed a Federal Employers' Liability Act claim against Illinois Central Railroad Company in the Tishomingo County Circuit Court for damages associated with the brain cancer and subsequent death of her husband, Phillip Childers (Decedent).  During discovery and pursuant to the parties' scheduling order, Childers designated Dr. Leonard White as her sole expert to establish causation between the Decedent's work with Illinois Central and his development of brain cancer.  Dr. White then

submitted his expert report, which concluded that the Decedent's brain cancer and subsequent death were caused by unhealthy exposure to certain toxins during his employment with the railroad company. Illinois Central filed a motion to exclude Dr. White's expert testimony, followed by a motion for summary judgment predicated upon the exclusion of that testimony. After conducting a hearing on the matter, the circuit court granted both of Illinois Central's motions. Childers appeals the circuit court's decision, arguing that the court erred by excluding Dr. White's testimony and by granting the dispositive motion. Finding no error, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2.     The Decedent worked for Illinois Central as a machine operator from 1971 to 1994. In December 2009, the Decedent developed glioblastoma multiforme, a form of brain cancer, and later died as a result. On November 13, 2012, Childers filed a FELA claim in the circuit court, alleging that the Decedent developed brain cancer as a result of exposure to toxic chemicals and agents and that the Decedent was never given the proper protective equipment to prevent the exposure. Illinois Central answered the complaint, and the parties agreed to a scheduling order. Pursuant to the scheduling order, Childers designated Dr. White as her sole expert for medical causation. Dr. White wrote a report in which he opined that the Decedent's brain cancer stemmed from unhealthy exposure to diesel exhaust and degreasing agents during his employment with Illinois Central. Illinois Central filed a motion to exclude Dr. White's testimony along with a motion for summary judgment depending upon the circuit court's granting its motion to exclude. The circuit court granted Illinois Central's motion to

exclude, finding that Dr. White's opinions did not meet the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court also granted Illinois Central's motion for summary judgment, finding that because White's testimony was excluded, Childers could not prove causation–a material element of her claim–and as such, no genuine issue of material fact existed. Childers now appeals this judgment.

## STANDARD OF REVIEW

¶3. "Our well-settled standard of review for the admission or suppression of evidence is abuse of discretion." *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (¶4) (Miss. 2004). The Mississippi Supreme Court has said that "the decision of the trial judge will stand unless we conclude that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id*. (internal quotation mark omitted).

¶4. Appellate courts review the grant or denial of a summary-judgment motion de novo, applying the same standard as the trial court. *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). "Summary judgments . . . should be granted with great caution" after viewing the evidence most favorably towards the non-moving party. *Brown v. Credit Ctr. Inc*., 444 So. 2d 358, 362-63 (Miss. 1983). After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted. *Miss. River Basin All.*, 230 F. 3d at 174.

## ANALYSIS

### I.    FEDERAL EMPLOYERS LIABILITY ACT

¶5. Under FELA, railroads are liable for injuries their workers sustain if the injuries are

3

cause by the railroads' reasonably foreseeable negligence. 45 U.S.C. § 51 (2012). FELA is the exclusive remedy for railroad employees who sustain injuries as a result of the negligence of the railroad. *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 416 (5th Cir. 2012). The statute charges railroad companies with the duty to provide reasonably safe work environments for their employees. *Id*. at 417. "FELA holds railroads to a prudent-person standard of care." *Ill. Cent. R.R. Co. v. Brent*, 133 So. 3d 760, 775 (¶32) (Miss. 2013). However, FELA does not make railroad companies the insurers of their workers' safety. *Ellis v. Union Pac. R. Co.*, 329 U.S. 649, 653 (1947). As such, in order to recover under FELA, workers must have been injured during the course and scope of their employment and by some negligence on the part of the railroad. *Id.*

¶6. Generally, in order to prevail in a FELA case, the plaintiff must prove the same elements as he would in a common-law negligence case. *Brent*, 133 So. 3d at 775 (¶32). The two legal standards diverge, however, on the element of causation. Plaintiffs have a more relaxed burden of proof in FELA cases and are tasked with providing far less evidence than in ordinary negligence cases. *Id.* at 768 (¶13). But plaintiffs must produce more than a mere scintilla of evidence of causation in order to prevail against their employers under FELA. *Id*. FELA's relaxed burden for causation is meant to protect plaintiffs' rights to trial, as summary judgment is appropriate "only upon a complete absence of probative facts supporting the plaintiff's claim." *Rivera v. Union R.R. Co.*, 378 F.3d 502, 506 (5th Cir. 2004).

¶7. As a general rule, in FELA cases, expert testimony is not necessary. *Huffman*, 675

4

F.3d at 419. But this "general rule gives way" where the evidence is beyond the understanding of the average lay juror; in those circumstances, expert testimony is imperative to properly break down the issues. *Id.* For example, where an injury is fairly self-evident, such as a car accident resulting in a broken limb, the average layman could deduce the resulting injury and its cause. *Id.* (citing *Moody v. Maine Cent. R.R. Co.*, 823 F.2d 693, 695-96 (1st Cir. 1987)). The causal link between a cancer diagnosis and exposure to harmful toxins, however, often requires the expertise and knowledge of a medical expert. *See Illinois Cent. R.R. Co. v. Jackson*, 179 So. 3d 1037, 1044-45 (¶¶18-19) (Miss. 2015) (noting that plaintiff's causation evidence came solely from two medical experts). Summary judgment is appropriate in the absence of medical expert testimony necessary to prove injury in a FELA cause of action. *Id*. at 1046 (¶¶22-23) (reversing a denial of summary judgment where the primary medical expert's testimony was deemed hearsay); *see also Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 504-05 (9th Cir. 1994) (affirming summary judgment where plaintiffs' experts were struck for failure to provide an explainable basis for their conclusions that exposure to workplace chemicals caused the plaintiffs' injuries).

¶8. Neither party in the case argues that medical expert testimony was not required to prove causation. This Court understands that the causal link between chemical and toxin exposure and a diagnosis of cancer is beyond the realm of an average lay juror's common knowledge. As such, this Court finds that expert medical testimony was the appropriate means to establish causation in Childers's case.

## II. ILLINOIS CENTRAL'S MOTION TO EXCLUDE

¶9.    Our primary focus is whether the circuit court erred in excluding Dr. White's expert medical causation testimony.  The circuit court found, and Illinois Central argues, that Dr. White's causal analysis was predicated upon studies that were unreliable, outdated, or unsupportive of his conclusions and did not take into consideration pertinent facts concerning the Decedent's medical history.

¶10.    Mississippi Rule of Evidence 702 charges trial-level courts "with being gatekeepers on questions of admissibility of expert testimony." *Canadian Nat'l/Illinois Cent. R. Co. v. Hall*, 953 So. 2d 1084, 1094 (¶31) (Miss. 2007).  Mirroring Federal Rule of Evidence 702, Mississippi Rule of Evidence 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) their testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Id.* at (¶30).  Courts determine the admissibility of expert witness testimony by following the standards set forth by the United States Supreme Court in *Daubert*, 509 U.S. at 579, and modified in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  This test was formally adopted into Mississippi jurisprudence in the case of *Mississippi Transportation Commission v. McLemore*, 863 So. 2d 31 (Miss. 2003).  In applying the *McLemore* test, expert testimony can only be admitted if it passes a two-pronged analysis.  *Id*. at 35 (¶7).  First, the expert testimony must be relevant, assisting the trier of fact with matters beyond that of a lay juror.  *Id.* at 36 (¶8).  Second, to determine reliability the Court considers the following illustrative

6

yet non-exhaustive list that the *Daubert* Court adopted: (1) whether the theory has been the subject of peer review and publication; (2) the known or potential rate of the error of the technique or theory when applied; (3) the existence of standards to control the technique's operation; and (4) the general acceptance the theory has garnered in the relevant expert community. *See McLemore*, 863 So. 2d at 36-37 (¶13).

¶11.    There is little question as to the relevancy of Dr. White's expert testimony. Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. "If the proffered evidence has any probative value at all, Rule 401 favors its admission." *McLemore*, 863 So. 2d at 40 (¶20). Further, if it is clear that the evidence will assist the trier of fact, the evidence is relevant. *Patterson v. Tibbs*, 60 So. 3d 742, 749 (¶22) (Miss. 2011).

¶12.    The underpinning of Childers's claim against Illinois Central is that the Decedent's brain cancer resulted from exposure to harmful toxins during his employment with the railroad company. As discussed above, Childers would only be successful in her FELA claim by proving Illinois Central's breach of duty and (primarily) that the Decedent's injury and subsequent death were *caused* by the negligence of the company. Because the average lay juror cannot rationally connect the chains of a causal link between these two variables, Dr. White's proffered testimony is clearly relevant.

¶13.    The crux of the controversy here relates to the reliability of Dr. White's testimony. Dr. White submitted a two-page opinion on behalf of Childers, concluding that the

Decedent's brain cancer and subsequent death were primarily caused by his exposure to a combination of diesel exhaust and degreasing agents during his tenure at Illinois Central. In his "additive theory," Dr. White opined that chemicals from diesel fuel and degreasing agents combined to cause the Decedent's brain tumor over time. Dr. White used the following nine studies to form the basis of his opinion:

1. Thomas, T.L., *Primary Brain Tumors Associated with Chemical Exposure*, Occupational Neurology and Clinical Neurotoxicology, Bleecker, M. And Hansen, J., Williams & Wilkins (1994) ("Thomas I study");

2. Maltoni, c. et. al., *Experimental contributions in identfying potential brain carcinogenesis in the petrochemical industry*, Annals New York Academy of Science, 381, 216-249 (1982) ("Maltoni study");

3. Schenker, M.B., et. al., *Diesel exposure and mortality among railway workers: results of a pilot study*, British Journal of Industrial Medicine, 41, 320-327 (1987) ("Schenker study");

4. Stern, F.B. et. al., *Exposure of motor vehicle examiners to carbon monoxide: a history prospective mortality study*, Arch Environ Health, 36(2), 59-65 (1981) ("Stern study");

5. Rushton L, et. al., *Epidemiological survey of maintenance workers in London Transport Executive bus garages and Chiswick Works*, British Journal of Industrial Medicine, 40, 340-345 (1983) ("Rushton study");

6. Thomas, T., et. al., *Risk of astrocytic brain tumors associated with occupational chemical exposures*, Scand J Work Environ Health, 13, 417-423 (1987) ("Thomas II study");

7. Heineman, E.F., *Occupational Exposure to Chlorinated Aliphatic Hydrocarbons and Risk of Astrocytic Brain Cancer*, American Journal of Industrial Medicine, (1994) ("Heineman study");

8. Thomas, T., et. al., *Brain tumors and occupational risk factors*, Scan J Work Environ Health, 12, 1-15 (1986) ("Thomas III study"); and

9. Howe, G.R., et. al., *Cancer Mortality (1965-77) in Relation to Diesel Fume*

*and Coal Exposure in a Cohort of Retired Railway Workers*, JNCL, 7(6), 1015-1019 (June 1983) ("Howe study").

In its order granting Illinois Central's motion to exclude, the circuit court held that these studies were either outdated, unreliable, or did not fully support White's conclusions. Upon review of the studies, we agree with the circuit court.

¶14. None of the nine studies White cited wholly support his conclusion that exposure to diesel exhaust and degreasing agents caused the Decedent's death. In fact, most of the studies either contradict White's causal conclusion in their results or conclude that further investigation and research were required on the subject matter. First, the Heineman study tested six different degreasing agents and found that only one of those six—methylene chloride—could be generally connected with cancer. The study also concluded that "evidence for the carcinogenicity of these six specific CAHs (chlorinated aliphatic hydrocarbons) is inadequate in humans." The study warned that "these results should be interpreted cautiously" and even the carcinogenity of methylene chloride should still be "evaluated in future studies." Finally, there is no concrete evidence in the record that the Decedent was exposed to methylene chloride during his employment at Illinois Central. Heineman offers little foundation for Dr. White to base his opinions upon.

¶15. Next, Dr. White relied upon three articles Dr. Terry Thomas wrote, all studying the potential for primary brain tumors and occupational exposure to chemicals. The Thomas I study, which was the earliest study (documented in 1986), ultimately concluded that "no causal industrial exposures had been identified," and the results of this study should be interpreted with caution. The 1987 Thomas II study examined the potential for brain tumors

9

in two "high risk industries"—petroleum refining and chemical manufacturing. In both industries, this study produced no statistically significant link between exposure to chemicals and brain tumors in the workers. In fact, the study showed the potential risk for brain tumors actually decreased with duration of employment in these industries. The Thomas III study, which was the most recent study completed in 1994, provides the most specific example of inconclusive results between brain tumors and chemical exposure. At the outset, the article states that "[a]though epidemiologic studies have suggested that there may be a relationship between the risk of brain tumors and occupational exposures to chemicals, no specific causative links have been documented." In fact, the article admits that (1) "it is difficult to link excess brain tumor risk with any specific chemical exposure" because the studies often do not take into account potential exposures at prior jobs, and (2) it is extremely difficult to narrow down exactly what chemicals a worker may be exposed to at a particular place of employment. Finally, the article concedes that "[n]o firm conclusion can be drawn regarding the role of any of these chemicals in the etiology of brain tumors." Thomas's three articles provide no support for Dr. White's opinion.

¶16. The Maltoni study analyzed the potential for brain cancer in lab animals that were directly implanted with three specific diesel-exhaust constituents into the animals. As Illinois Central states in its brief, White testified that he was unsure the Decedent was exposed to the three chemicals used on the lab animals and did not know whether the level of the Decedent's exposure was even comparable to the direct implantation of the chemicals in the animals. The Rushton and Stern studies examined the carcinogenity of exposure to certain

10

toxins among bus workers and motor vehicle examiners, respectively. Illinois Central argues that these studies are hardly relevant because the Decedent held neither of these positions. Irrespective of employment, both studies showed statistically insignificant association between the surveyed toxins and potential for brain cancer.

¶17.    Finally, Childers cites to the Howe and Schenker studies as the primary basis for White's opinion.  The major finding in the Howe study, however, was an elevated risk for lung cancer among individuals exposed to diesel fumes–primarily carmen.  Also, Howe is another example of a study that "warrants further investigation."  The Schenker study compared the mortality rates of railway workers exposed to diesel exhaust.  Schenker specifically warns readers that the study merely provides a pilot study "designed to test the feasibility of a larger retrospective cohort study and not to test the hypothesis that exposure to diesel may cause cancer."  Also, Schenker acknowledges more than once in the study that an increased risk of cancer from exposure to diesel exhaust was *not* statistically significant.

¶18.    "Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590.  After reviewing the nine studies, the literature Dr. White cites does not validate his conclusions.  The fact that none of the studies fully support Dr. White's contention results in an analytical gap that could easily mislead the jury.  Illinois Central correctly points to *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and *Watts v. Radiator Specialty Co.*, 990 So. 2d 143 (Miss. 2008), to come to this same conclusion.  In *Joiner*, a city electrician sued General Electric, among others, after being diagnosed with small-cell lung cancer.  *Joiner*, 522 U.S. at 139.  Joiner

11

relied on the testimony of expert witnesses to establish causation between his occupational exposure to polychlorinated biphenyls (PCBs) and his subsequent lung cancer diagnosis. *Id*. The defendants argued that Joiner's expert, who cited four epidemiological studies, failed to establish a causal connection between the PCB exposure and Joiner's lung cancer. *Id*. at 140. The United States District Court and Supreme Court ultimately agreed, finding that studies, viewed individually or in combination, failed to provide a significant basis for the opinion. *Id*. at 146-47. The four studies in *Joiner* are similar to the nine Dr. White cited—they either provided statistically insignificant results or were inconclusive to establish a legitimate causal link between the exposure and cancer. *Id*. The United States Supreme Court urged lower courts in its opinion to examine both the methodology *and* conclusions of experts when determining whether to exclude unreliable testimony:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id*. at 146.

¶19. In *Watts*, the plaintiff enlisted the opinion of a medical expert to prove that his exposure to the benzene contained in Liquid Wrench resulted in his non-Hodgkins lymphoma. *Watts*, 990 So. 2d at 146 (¶8). The Mississippi Supreme Court examined the eighteen studies cited by the plaintiff's expert and found the following: (1) only half of the epidemiological studies showed a significant increased risk of cancer due to benzene exposure; (2) none of the studies directly dealt with chemical exposure and the development

12

of non-Hodgkins lymphoma in the plaintiff's profession; (3) at least two of the studies reported no significant increase of risk of cancer after exposure to benzene; and (4) at least one study acknowledged that there was no scientific basis to support a causal link between benzene exposure and non-Hodgkins lymphoma. *Id.* at 147 (¶10). The supreme court, citing to *Joiner*, held that such a "leap across the chasm from the data in the studies to [the expert's] proffered opinion was more than the trial court could allow." *Id.* at 150 (¶19). The Court concluded that such an analytical gap between a weak collection of studies and the expert's attempted causal link was one that the circuit court appropriately excluded from the jury. *Id.* at (¶20).

¶20.   Here, the studies Dr. White cited are similar to those analyzed in *Joiner* and *Watts*. Although some of the studies acknowledged that their findings should be interpreted cautiously, others provide statistically insignificant results linking exposure to cancer at all. The two primary studies White utilized, Howe and Schenker, do not even provide concrete conclusions that chemical exposure results in an increase of brain tumors. Howe's major findings relate to lung cancer while Schenker's studies of respiratory cancer garnered statistically inconclusive results. Also, similar to *Watts*, none of the studies deal directly with the results of chemical exposure and the development of brain tumors in the Decedent's particular railroad job. Finally, *more* than one study cited by Dr. White acknowledged that no concrete basis existed to support the contention that occupational exposure causes brain tumors. Childers argues that *Joiner* and *Watts* do not apply because such an analytical gap does not exist in this case. But the fact that almost none of Dr. White's case-studies support

13

a causal connection presents an even wider gap than in *Watts*. Further, the jury cannot rely upon a collection of inconclusive and inconsistent studies, many of which require further investigation, to connect the Decedent's occupational exposure to his brain tumor. For Dr. White's opinion to pass *Daubert*'s reliability test, there must be "some evidence of support and acceptance in the scientific community." *Patterson*, 60 So. 3d at 751 (¶31). This is not the case here. Dr. White's case-studies, at best, garner minimal support for his expert opinion, which hardly prompts this Court to reverse the circuit court.

¶21. The parties address several other factors in their arguments to support or refute Dr. White's reliability. First, Illinois Central points to Dr. White's flawed use of the "Bradford Hill" criteria to try and establish causation. The "Bradford Hill" criteria are used in epidemiological studies to determine whether the association of two variables is truly causal. *Pounds v. Rogersol Inc.*, No. 3:07-CV-554-WHB-LRA, 2010 WL 11527412, at *4 (S.D. Miss. June 15, 2010). The test uses the following nine criteria to determine causation: "(1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of the findings; (5) biological plausibility (coherence with existing knowledge); (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge." *Id*. Dr. White testified that he used the "Bradford Hill" criteria to determine causation between the Decedent's brain cancer and exposure to diesel exhaust and degreasing agents. Illinois Central argues that Dr. White's expert opinion is proven more unreliable by the fact that, at most, only three of the nine criteria were met connecting diesel exhaust and degreasing agents to brain tumors. But this

14

argument by itself does not preclude Dr. White's admission as an expert because these criteria are more guidelines than strict rules, and all criteria need not be met for causation to be probable. *Id.*

¶22. Next, Illinois Central relied on two of its own experts to criticize Dr. White's failure to use more current case studies and to prove that Dr. White's opinion was not widely accepted among the scientific community. In his research, Dr. White testified that the most recent article regarding occupational exposures and their relation to cancer was the Heineman study in 1994. But Illinois Central presented the circuit court with an affidavit and report from its own medical expert, Dr. Jill Barnholtz-Sloan, wherein she found over 3,000 articles related to brain tumors and their risk factors, with over 50% of those articles being peer-reviewed. Dr. Barnholtz-Sloan then cited to a 2014 article, which she had co-authored, analyzing brain tumors and the associated risk factors, an article which Dr. White did not cite in his opinion. The age of an expert's case study may not be a detrimental factor towards the decision to admit or exclude evidence, but it is certainly something that courts consider when evaluating the reliability of an expert's basis for the opinion. *See Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 (5th Cir. 1994) (affirming the district court's decision to exclude an expert's testimony based on the expert's use of outdated case studies, among other reasons).

¶23. Finally, the circuit court found that Dr. White failed to consider certain pertinent facts of the Decedent's medical history in his causative analysis. Childers claims that Dr. White's analysis used a differential diagnosis to rule out a family history of brain cancer. Also, he eliminated alcohol as a confounding factor to his cancer. Childers admitted, however, that

15

the Decedent smoked at least one pack of cigarettes a day from 1970 to 1982 during his employment with Illinois Central. In his testimony, Dr. White admitted that he was unaware of the Decedent's extensive smoking history. Childers argues that this should not weigh against the admission of Dr. White's testimony because none of Illinois Central's experts attributed the Decedent's brain cancer to smoking. But Dr. White himself acknowledged that cigarettes contain polycyclic aromatic hydrocarbons, one of the constituents found in diesel exhaust. Again, while this alone would not warrant exclusion of Dr. White's testimony, the fact that Dr. White was completely unaware of the Decedent's smoking history, particularly during his employment with Illinois Central, is certainly valid for the circuit court's consideration.

¶24. Experts who testify before a jury are required to build their opinions upon a reliable foundation. *Worthy v. McNair*, 37 So. 3d 609, 615 (¶16) (Miss. 2010). In their roles as gatekeepers, trial-level courts must ensure that expert testimony is well-grounded in scientific methods and procedures and not the products of mere subjective beliefs or unsupported speculation. *Id*. Dr. White submitted his opinion before the circuit court that the Decedent's exposure to a combination of diesel exhaust and degreasing agents caused his brain cancer. In framing his opinion, Dr. White used nine articles that were either wholly unsupportive of his conclusions or were so unreliable that the articles themselves warned against reliance upon their conclusions. None of the articles he used concretely connected occupational exposure to diesel exhaust and degreasing agents to a risk of brain cancer. Further, the most recent articles Dr. White cited date back to 1994, even though a search by Dr. Barnholtz-

16

Sloan's search revealed thousands of articles dating up to 2014. Dr. White applied the "Bradford Hill" criteria to his methodology but discovered that three criteria, at most, supported his conclusion. As the circuit court correctly stated, Dr. White was unaware of the Decedent's smoking history during his employment with Illinois Central, a pertinent fact due to the chemicals contained in cigarettes. Taking all of these factors into consideration, we find that the circuit court was within its discretion to exclude Dr. White's testimony.

### III. ILLINOIS CENTRAL'S MOTION FOR SUMMARY JUDGMENT

¶25. Childers also appeals the circuit court's decision to grant summary judgment in favor of Illinois Central. This motion was predicated on the exclusion of Dr. White's testimony. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact. . . ." M.R.C.P. 56(c). Evidence must be viewed in the light most favorable to the non-moving party. *Brent*, 133 So. 3d at 767 (¶12).

¶26. Trial-level courts in this State apply federal standards when determining whether a FELA claim survives summary judgment. *Id.* at 767-68 (¶13). As explained, FELA requires a much more relaxed burden of proof in order to protect the plaintiff's right to trial. *Id.* But although the burden to establish causation in a FELA action is less than that required in an ordinary negligence action, the plaintiff must provide the court with *some* showing of a causal relationship. *See Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957). Childers designated Dr. White as her sole medical expert to prove causation. The circuit court excluded Dr. White's testimony as unreliable and therefore found that Childers was unable

17

to meet her burden to prove causation. Without some evidence of a causal link between the Decedent's cancer and his occupational exposure, Childers's FELA claim fails. Because we affirm the circuit court's decision to exclude Dr. White's testimony, we likewise affirm the court's decision to grant summary judgment in favor of Illinois Central.

## CONCLUSION

¶27. Childers presented only Dr. White's expert medical testimony to prove causation in her FELA claim. As such, her claim hinged upon Dr. White's opinion passing the expert testimony standard set forth in *Daubert* and adopted in *McLemore*. The circuit court found that Dr. White used nine studies to form his opinion that were outdated, unreliable, or completely contradictory of his conclusions. We agree with the circuit court and find no abuse of discretion in the exclusion of Dr. White's testimony. Because Childers presented no other evidence to prove that the negligence of Illinois Central caused the Decedent's brain cancer, we also affirm the circuit court's decision to grant summary judgment in this case.

¶28. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. McCARTY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, McDONALD AND LAWRENCE, JJ.**

**McCARTY, J., SPECIALLY CONCURRING:**

¶29. I agree with the majority's thoughtful examination of the *Daubert* issue in this appeal. I write separately to emphasize that simply because a theory is cutting edge does not require it to be excluded. Furthermore, the credibility of an expert is a matter for a jury to weigh, not a judge.

¶30.    Our Rule 702 is concerned with whether "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." M.R.E. 702(a). The majority correctly emphasizes that the reliability of a method is important to establish prior to admissibility. *See* M.R.E. 702(c). This does not prevent cutting edge or brand new science from admission.[1]

¶31.    Likewise, some of the attacks on the expert in the trial court did not concern Rule 702 but were aimed at the credibility of the expert. Yet "judging the expert's testimony and weight to be accorded thereto is the province of the jury." *Fleming v. Floyd*, 969 So. 2d 868, 878 (¶25) (Miss. 2007). This consideration includes the credibility of expert witnesses, who at the end of the day are still just witnesses.[2]

¶32.    I believe we must remain focused on the core issue: whether the expert's opinion helps a jury perform its function to resolve disputed questions of fact and law. An expert might establish what species of dogs have certain types of jaws, why their skulls are shaped

---

[1] Indeed, for many years now, federal courts have allowed juries to consider new scientific theories and bases for liability. For instance, the Third Circuit Court of Appeals has ruled that the testimony of an expert should not be excluded "simply because the conclusion was 'novel' if the methodology and the application of the methodology were reliable." *Heller v. Shaw Indus. Inc.*, 167 F.3d 146, 153 (3d Cir. 1999). Citing *Heller*, the Eighth Circuit has followed suit, holding that "[b]oth our cases and the decisions of the Supreme Court make clear that it is the expert witnesses' methodology, rather than their conclusions, that is the primary concern of Rule 702." *Bonner v. ISP Techs. Inc.*, 259 F.3d 924, 929 (8th Cir. 2001).

[2] The federal courts have again plowed much ground on this subject, ruling repeatedly that concerns about certain expert opinions "go to [the expert's] credibility as a witness, not to the admissibility of his testimony as an expert." *Kuhn v. Wyeth Inc.*, 686 F.3d 618, 628 (8th Cir. 2012); *see also Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 976 (8th Cir. 1995) ("Although it is common that medical experts often disagree on diagnosis and causation, questions of conflicting evidence must be left for the jury's determination.").

19

a certain way, and how hard they bite. Yet only a jury can ultimately resolve whether a dog bite caused harm.

**WESTBROOKS, McDONALD AND LAWRENCE, JJ., JOIN THIS OPINION.**