# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-01596-SCT

*T.L. WALLACE CONSTRUCTION, INC., THOMAS
WALLACE AND JANETTE WALLACE*

*v.*

*McARTHUR, THAMES, SLAY, AND DEWS, PLLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/23/2015 |
| TRIAL JUDGE: | HON. ANTHONY ALAN MOZINGO |
| TRIAL COURT ATTORNEYS: | MICHAEL T. DAWKINS |
| | J. STEPHEN KENNEDY |
| | JOE SAM OWEN |
| | LAUREN RUTH HILLERY |
| | DAVID M. OTT |
| | WILLIAM A. WHITEHEAD, JR. |
| | KRISTOPHER ALAN POWELL |
| | EVERETT EAVES WHITE |
| | STEVEN JOEL JOHNSON |
| | BRAD ASHLEY TOUCHSTONE |
| | JOSEPH RANDLE TULLOS |
| COURT FROM WHICH APPEALED: | MARION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | J. STEPHEN KENNEDY |
| | AMY LEWIS CHAMPAGNE |
| | SAMUEL DEUCALION GREGORY |
| | JOE SAM OWEN |
| ATTORNEYS FOR APPELLEE: | DAVID M. OTT |
| | WILLIAM A. WHITEHEAD, JR. |
| | DONALD C. DORNAN, JR. |
| | KRISTOPHER ALAN POWELL |
| | LAUREN RUTH HILLERY |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED IN PART AND REMANDED.  ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 06/29/2017 |
| MOTION FOR REHEARING FILED: | |

MANDATE ISSUED:

**BEFORE WALLER, C.J., KING AND MAXWELL, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.    In this auditing malpractice case, Thomas L. Wallace and T.L. Wallace Construction, Inc. ("Wallace" or "Wallace Construction") appeal the Marion County Circuit Court's decision granting summary judgment in favor of McArthur, Thames, Slay, and Dews, PLLC ("McArthur Thames") for lack of causation. Wallace seeks to recover damages of approximately $14,000,000 allegedly suffered by him as a result of accounting work done by McArthur Thames.

¶2.    Wallace filed suit against McArthur Thames, alleging that the accounting firm had negligently audited the financial statements of Wallace Construction and ultimately had caused the destruction of the company by failing to discover hundreds of personal credit card purchases by certain company employees, failing to discover transactions involving hundred of thousands of dollars spent by Wallace Construction to pay for personal home improvements of nonshareholder employees, and by failing to discover inappropriate accounting practices that resulted in an overstatement of income.

¶3.    The trial court excluded the testimony of Wallace Construction's sole expert on causation, finding that his opinion was unreliable and insufficient to establish proximate cause. The trial court then held that, because expert testimony on causation was required in malpractice cases, Wallace Construction's complaint must fail as a matter of law. Wallace Construction appeals and asks this Court to reverse the trial court's decision to grant

2

summary judgment. McArthur Thames cross-appeals and alleges that, in the alternative, the trial court erred in failing to dismiss Wallace Construction's complaint as barred by the statute of limitations, in limiting discovery of financial information to June 30, 2012, and in barring discovery of the Wallaces' personal accounts.

¶4. Because the trial court mistakenly believed that expert testimony establishing causation was required in all malpractice cases, and because Wallace Construction presented sufficient lay testimony to overcome summary judgment on the issue of causation, we affirm in part, reverse in part, and remand the case the trial court for further proceedings consistent with this opinion. In addition, we find that the trial court abused its discretion in disallowing reasonable access to the financial information of Wallace Construction subsequent to June 30, 2012, and in its denial of discovery of the Wallaces' personal accounts.

## FACTS

¶5. Thomas L. Wallace ("Wallace") founded T.L. Wallace Construction, Inc. ("Wallace Construction") in 1975 and was the sole owner and shareholder of the company until Construction Management Trust I and Construction Management Trust II took ownership in 2012. Wallace Construction, a multimillion-dollar enterprise based out of Columbia, Mississippi, specialized in heavy/civil construction and commercial transportation projects and specifically in road and highway construction. The company also served as a general contractor for utilities, disaster response, and public works projects throughout the Southeast.

¶6. Because Wallace Construction had engaged in large construction projects, it was required to obtain construction bonds. Bonding companies required audited financial

3

statements before issuing a bond. McArthur Thames is a public accounting firm located in Hattiesburg. McArthur Thames conducted financial statement audits for Wallace Construction and prepared its federal income tax returns.[1] For each financial statement audit McArthur Thames conducted of Wallace Construction from December 31, 2007, through 2011, Raymond Polk served as McArthur Thames's certified public accountant in charge of the audits.[2] McArthur Thames prepared the Wallaces' personal financial statements and federal income tax returns as well.

¶7.    Each year McArthur Thames had issued an unqualified opinion in a Report of Independent Certified Public Accountants to the Board of Directors of Wallace Construction. The opinion provided that the financial statements of Wallace Construction "present fairly, in all material respects, the financial position of" Wallace Construction as of each year end and "the results of operations and its cash flows" for each period audited "in conformity with accounting principles generally accepted in the United States of America." The balance sheets compiled by McArthur Thames showed Wallace's investment in Wallace Construction as an asset with a value equal to or derived from the audited net worth of the company.

¶8.    Wallace Construction additionally employed its own in-house accounting staff. Each year, employees of the Wallace Construction accounting department certified that the information given to McArthur Thames for audit purposes fairly presented the financial

---

[1]McArthur Thames did not advise Wallace, Wallace Construction, or its management on hiring, equipment, bidding, or any other aspect of the company, including how much money to take in distributions each year.

[2]McArthur Thames ultimately rescinded its March 15, 2012, audit of the 2011 year.

4

position, results of operations, and cash flows of Wallace Construction. Each year Wallace Construction also represented that it had no knowledge of any fraud or suspected fraud affecting the company.

¶9. Wallace owned a hundred percent of the stock of Wallace Construction, and Wallace and his wife had paid their personal expenses through the business. Before 2012, the only credit cards that Wallace and his wife had owned were company credit cards. Wallace testified that he had considered the personal expenses to be distributions on which he would pay taxes at the end of the year. Wallace denied running personal expenses through his business to avoid paying taxes on them, but stated that it was just the way he did business. Although Wallace had not told anybody preparing his taxes that they needed to account for the personal expenses as money on which he would be taxed, Wallace testified that he had always run personal expenses through his company and had relied on his accountants to take those personal expenses out for tax purposes in their yearly audits. Wallace had a fifth-grade education and testified that he did not know how the bookkeeping department handled the personal expenses and that he thought he had been paying taxes on those expenses. Wallace stated that he had trusted the people that he had hired to correctly put expenses where they needed to go.

¶10. T.J. Dunaway had been in charge of bookkeeping and accounting at Wallace Construction since the 1990s. Alford, the accounting manager, testified that auditors would find personal expenses charged to the company in the 1990s and would reclassify them in

5

adjusting journal entries.[3] Alford had been in accounting for thirty years and was aware that when she booked items under job costs, that was not where the expenses were supposed to go. Alford did not volunteer the information that Wallace ran personal expenses through the company but testified that she did not do anything that kept the auditors from finding the personal expenses. She stated that if the auditors found personal expenses and asked a question, that the bookkeeping staff would send the auditor to Dunaway. This would keep Alford "out of an awkward situation." Dena Arinder originally was the Accounts Receivable Clerk at Wallace Construction and then became the office manager. She testified that when Polk from McArthur Thames came to Wallace Construction to conduct the audit each year, he never asked about any expenses not being booked or mentioned that the expenses were not being recorded properly. Polk had asked questions only about jobs and how the jobs were progressing.

¶11.    Wallace retired in 2006 and left the company to be run by the Board of Directors that he had appointed.[4] Wallace had known most of the Board members for years and had attended church with them. The six Board members were:

- Wallace – 100% shareholder of the company;

---

[3]When Wallace retired in 2006, the company moved Alford to take charge of Wallace's personal accounts. Teah Thornhill then became the accounting manager.

[4]Wallace claims that he retired from the company in 2006 but had not told anybody that he had retired and had not had a retirement party. Wallace stated that everybody had known he had retired. Wallace stated that when he retired, he stopped coming in for day-to-day operations but continued to attend some of the company board meetings.

6

- James Carney – Wallace's brother-in-law and pastor – Chairman of the Board;[5]
- Jay Carney – Brother Carney's son and Wallace's nephew – President of Wallace Construction;
- T.J. Dunaway – Chief Financial Officer (CFO);
- Mike Wallace – Wallace's son; and
- Darryl Harris – hired in November 2009 as the Chief Operating Officer (COO).

After retirement, Wallace continued to draw a salary from the company and continued to pay personal expenses through the company. From 2007 to 2009, Wallace's salary had averaged almost $800,000 each year and from 2010 to 2011, Wallace's salary was more than $500,000 a year. Wallace also had owned the property on which Wallace Construction was located and had collected more than $2.5 million in rent from the company. Wallace had put Jay and Dunaway in charge of the day-to-day running and operation of the company. Arinder testified that Dunaway had been in charge of the day-to-day decisions regarding the company and that Jay "did a lot of politicking." Company employees went to Jay and Dunaway for questions instead of to Wallace.

¶12. Wallace contends that, after his retirement, certain Wallace Construction employees had begun charging unauthorized personal expenses to the company. These personal expenses would then be added to job costs in the accounting system. Wallace alleged that between 2007 to 2011, approximately $3.7 million in personal expenses had been added to

---

[5]James Carney is referred to as "Brother Carney" throughout the record. Although Brother Carney had a company credit card and was on the Board, he stated that he did not have a prominent role in the company and attended only Board meetings and conventions.

job costs.[6] During this time period, Wallace alleged that costs had been shifted among jobs in an apparent attempt to cover up personal and/or excessive expenses. Moreover, Wallace contended that management excessively had allocated indirect overhead to job costs, which had the effect of increasing the percent complete on jobs. This practice allowed more revenue and gross profit to be reported than otherwise should have been. Accounts receivable also had been booked when no basis existed to record the receivables, which resulted in overstated job profits. And Wallace alleged that company management had engaged in improper underbidding on jobs at levels that could not reasonably be expected to be profitable.

¶13.   Certain Wallace Construction employees and members of Wallace's family had company credit cards, including: Mike Wallace, Tonya Wallace, Jay, Dunaway, Brother Carney, and Harris. Wallace testified that he had not reviewed his employees' credit card bills but stated that he would have had access to any information he wanted at the company if he had asked for it. However, he had trusted his employees completely and did not think there was any way that they would steal from him.

¶14.   Around 2009, "shop accounts" were set up for certain employees, including each of the Board members.[7] A general account existed in the Wallace Construction accounting system called "shop." Each employee who had a shop account had a corresponding number

---

[6]Arinder's adjusted financial reports indicated that $3,033,041 of Wallace's personal expenses had been paid by the company, along with $1,396,625 of nonshareholder expenses.

[7]Arinder testified that she knew that an Internal Revenue Service agent had known about the shop account for T.J. and had asked about it in 2010.

8

to identify him or her. Shop accounts also existed for Wallace's farm, for his catfish pond, and for the improvements on his yard. Inside the shop accounts were detailed accounts that showed to whom the expenses had been coded, so the accounting department could generate a report at any time to see how much a particular individual had spent. Wallace contends that he had not known about the shop accounts. However, T.J. signed an affidavit stating:

> In order to assure that Mr. T.L. Wallace who is the 100% shareholder of [Wallace Construction] could see how much of the funds of [Wallace Construction] were being diverted to each employee as he had directed, I set up certain accounts to track these expenditures that were on behalf of individuals and not for purposes of the ongoing business concern of [Wallace Construction].

Before the shop accounts existed, Dunaway stated that personal expenses had been coded to other job costs or to jobs. Arinder was in charge of the accounts receivable and testified that she was unaware if Wallace knew about the shop accounts. Arinder testified that the accounting staff at Wallace Construction had never been told to track personal expenses to give them to the auditors for reclassification as distributions.

¶15. After Wallace's retirement, the company began to have financial problems. Arinder testified that Wallace Construction had cash flow problems even in 2009. She testified that the staff would have to hold checks and wait until Dunaway told them when to send a check to the vendors. Arinder testified that the whole accounting department, plus Jay and Harris, had known that checks had to be written and held. She stated that Polk also had known because he had to reverse them at the end of the year. She testified that it was a monthly thing and that some of the project managers also knew that checks were being held "because they

9

would need supplies or whatever and come back and ask if we were holding a check." Arinder did not know if Wallace had been aware that checks had to be held.

¶16. Teah Thornhill, the office manager for the company, testified that in late 2011 or early 2012, the company had suffered a cash crisis and that bookkeeping began having daily meetings to discuss receivables, payables, who the company could pay and how much cash the company had.

¶17. On March 11, 2012, Dunaway, Brother Carney, Jay, and Harris went to Wallace's house to tell him that the company "could not go any further; they had to have revenue, and . . . they had exhausted all means." Wallace testified that he went into the office the next Monday morning "to try to figure out what was going on." In an attempt to provide enough immediate cash to save the company, Wallace sold a piece of property for $1.3 million. Wallace testified:

> And Jay told T.J., said, Call Cecil Estes and tell him to come on. We can give him a half million dollars now. Well, that was another shock. I said, What do you owe Dixon & Bowen – this asphalt company. What do you owe them a half million dollars for? Man, half your money is gone. What's the deal? Well they said, Well, said – I said, What do you owe that for? Well, it's work that we had been getting asphalt from them to do different jobs. And I said, Well, is this all you owe them? They said, no, sir, we owe them about $900,000. I said, Man, you know, here I just give you a million 3 and you – I mean, what's the deal? How much more you owe?

Employees of the company informed Wallace that the company had not paid its contractors in three months. Wallace stated that his attorney brought in an auditor at that point and that, after four days, his attorney told him that the company had been "broke" for three years.

10

¶18.    Hartford had pulled bonding from Wallace Construction in 2011 and Arch had pulled bonding afterward. For approximately three months in 2012, Wallace Construction had been unable to bid on new jobs. Wallace testified that there was no way he could continue operating Wallace Construction in the spring of 2012 because of the amount of debt. Wallace testified that the more he dug, the more debt he found, and that there was no way to keep operating. Wallace's attorney also informed him that there was no way that Wallace could save the company.

¶19.    In Spring 2012, prospective purchasers of the company, Thomas Duff and James Duff, conducted a valuation of the company and discovered that the company's net worth had been grossly overstated. Facing questions, McArthur Thames withdrew its 2011 audit of the company financial statements. The Duffs' CPA worked with Arinder to amend the company financial statements. Arinder had a bachelor's degree in finance with a minor in accounting, but she was not an accountant and did not hold any professional or certified licenses. Arinder was tasked with reclassifying the personal expenses that had been run through the company. Arinder identified costs that appeared to be personal in nature, examined the underlying invoices to determine whether they were legitimate business expenses, and then reclassified the expenses that in fact were personal in nature.

¶20.    Arinder went back and revised the company job schedules from 2007 to 2011. Several jobs changed after personal expenses were taken out. Arinder found some personal expenses under certain jobs, including the B.P. oil spill account, and stated that the expenses had been coded to the jobs directly. Arinder additionally found personal expenses that had been run

11

through the shop accounts under their individual cost codes. The adjustments to the financial statements showed a significantly lower value of the company.

¶21. Wallace personally had indemnified the bonds and stated that the Duffs had "stood the bonding companies off, and people, till we could get everything nailed down." On June 30, 2012, Wallace sold the company to the Duffs for $1,000. The Duffs additionally required Wallace to assume around $1.8 million in personal debt owed by Wallace Construction to Wallace's church, himself, his daughter's company, and to McArthur Thames. Wallace stated that he and his wife had lost everything and had been "broke."

¶22. The Wallaces began an investigation into the personal expenses of Wallace Construction employees. Wallace had authorized some of the personal expenses for certain employees as gifts. Conflicting testimony exists as to how much spending Wallace had known about and had authorized. Wallace contends that he did not know that his employees had been charging the company for personal expenses outside of the expenses that he specifically authorized. Wallace admittedly had authorized Wallace Construction to pay for the foundation and dirt work on Dunaway's and Jay's houses while they were being constructed. Wallace stated that he had not authorized anything outside of the foundation and dirt work and had expected that to cost around $50,000. Wallace did not tell anyone in the accounting department that he expressly had authorized those expenses but testified that he had told each individual person how much he was giving him.

¶23. Dunaway testified that Wallace had authorized the diversion of approximately $100,000 each of material, assets, and funds of Wallace Construction to Jay and himself to

12

supplement their salaries "for the significantly increased amount of work and responsibility" that they were undertaking for the company. Thornhill was told that "management had a special arrangement with Mr. Wallace on those expenses." Dunaway also informed Alford of the "special arrangement" and told Alford that if she wanted to verify what he was telling her that she was free to speak with Wallace. Alford did not speak to Wallace about it.

¶24. As a result of his personal credit card purchases, Dunaway resigned from the company.[8] He signed an affidavit stating that:

> Mr. T.L. Wallace was aware and not only consented to, but directed that these funds be diverted to pay employees in this manner for purposes of avoiding payment of income taxes both by himself and these employees.

> I was discharged by [Wallace Construction] because of personal use of the company credit card. These charges were incurred based on the direction and understanding from Mr. Wallace that I was to utilize this method of paying myself bonuses consistent with his instructions.

¶25. The personal expenses had been recorded in the shop accounts for each person. Arinder testified that she had assumed that if Dunaway had been trying to steal from the company, he would have attempted to hide it. Anybody who wanted to look at the job cost could have seen what had been spent on Dunaway's house. Wallace testified that he had visited Dunaway's house while it was being built but that he never asked Dunaway how he had been able to afford the house even though he knew how much money Dunaway earned. Wallace likewise had visited Jay's house when it was being built and had seen an employee

---

[8]Wallace Construction later filed an insurance claim for employee dishonesty regarding Dunaway in the amount of $152,262 for improvements to personal residence and $334,564 for personal credit card expenditures, for a total claim of $486,826. Wallace Construction filed an insurance claim for employee dishonesty concerning Harris in the amount of $45,525.

from Wallace Construction working on the house. Wallace stated that he had asked the employee what he was doing over there and the employee had stated that he was doing some odds and ends to get the house finished for Jay and his family to move in.

¶26. Jay testified that he had assumed that when Wallace had told Jay he would help him build his house that it would be in the $100,000 range. Jay testified that Wallace had been aware that work had taken place at his home and that Wallace had even ridden with Jay a couple of times to Jay's house and had seen some of what the workers were doing. Jay also testified that when he was out of town, Mike Wallace had called and said, "We took care of your road while you was out of town working" and that Mike had called Wallace and told him about the road.

¶27. Jay testified that there had been a misunderstanding between Wallace and himself and that, after the investigation, Wallace had stated that he had not directed that work. Jay had a meeting with Dunaway and Wallace, and Wallace asked Jay to tell Austin Morgan, the new chief operating officer of Wallace Construction, that Wallace had not approved the work on his home. Jay went to the office and told Morgan that Wallace had said he had not directed Jay to do that work and that he had not approved of that work. A week before his deposition, Jay signed a Promissory Note for $142,341, plus interest, to repay Wallace Construction for what Wallace said he did not authorize or approve. After signing the promissory note, Jay continued as president of the company.

¶28. Some of Mike's personal expenses also were charged to the company. He took his family on a vacation that was paid for by the company with Wallace's authorization. The

14

company additionally paid for Mike's house slab and dirt work. Mike had knowledge that equipment and men went to work on Jay's, Harris's, and Dunaway's houses and testified that it was a common occurrence for workers who were not on jobs to be utilized in that fashion and that it had been going on for as long as he had been on the Board.

¶29. In addition to Jay's, Dunaway's, and Mike's houses, Wallace authorized management to divert roughly $50,000 to Randall Lambert, Wallace's nephew, to help him build his house. This was not accounted for through payroll to Lambert. Wallace Construction had diverted company funds to TLW, Inc., which was one hundred percent owned by Wallace's daughter, Tonya. Likewise, Wallace had the company pay a full salary with health insurance and 401k benefits to Jerron Carney, another of his nephews, even though Jerron did not work for the company and was a full-time preacher at Wallace's church. Jerron had a company truck with fuel and maintenance paid by the company as well.

¶30. Brother Carney testified that he had general knowledge that the Wallaces had run personal expenses through the company and that he had been aware of it since he had been a manger of the company in 1974. Brother Carney testified that Wallace had known of and had given approval for the construction of Jay's driveway and that all members of the Board had known about it. Brother Carney testified that Jay's house had been built on property conveyed to him by Wallace. Brother Carney believed that Jay would have had Wallace's permission to spend the $160,000 of company resources for personal benefit and did not think that Jay would steal from the company. Brother Carney testified that, in 2007 or 2008, if he had any reason to believe that Dunaway had been stealing from Wallace that he would

have taken some action. When asked if he would have gone to Wallace and reported any rumors, he testified that, "Yeah well, it wasn't hid. I mean, it was open. It wasn't nothing under the covers, you know."

¶31.   Wallace alleges that the date that damages began was April 1, 2008. This is the date that McArthur Thames provided the results of its 2007 audit. Wallace testified that, at that time, McArthur Thames should have informed the entire Board of the personal expenses that had been charged to the company. When asked what Wallace would have done had he known about the personal expenses at that time, Wallace testified:

> I would have never dreamed of T.J. doing anything like this. And I would have been shocked beyond.
>
> Now, then, if I'd have found out that – you know, I would have figured, if T.J. hadn't told me, if I had not found out, my auditor, he should have caught this and that he told me about it, I would have done something about it.
>
> I can't sit here today and tell you exactly what I would have done. I can imagine what I would have done, but I would have never dreamed T.J. Dunaway doing what I know he's done now.
>
> So I can't tell you exactly what I would have done at that point in time, but I can tell you that I would have done this: If my auditors – if it'd been Harry McArthur, Harry McArthur would have called me and – called me in and went over this with me. Then I would have been able to do something about it.
>
> But I can't tell you what I would have done at that point in time, but I can tell you this: When I found out what was being done; I would have stepped back in the company, I would have demoted him or probably fired him. And that's no if and ands about that.
> . . . .
>
> But if I'd have known – if my auditors would have told me what was going on in '08, '09, even '10, I could have stepped back in my office and run that company. I could have salvaged my company.

16

Wallace stated that he had thought he had the money to spend. He testified that he had given a million dollars to foreign missions and that he would not have done that if he had known he was "broke." Wallace testified that McArthur Thames never sat down with him to go over a statement. He stated that he had not known how to read financial statements and had relied on McArthur Thames's representations. Wallace testified: "But I got the bottom line, and it looked good to me, and that's all I know to read on a statement. I don't have the education that I can go over and go through it item by item."

¶32. The Internal Revenue Service ("IRS") discovered the misreporting of personal expenses and began an audit on the company for the years 2008 to 2011.[9] Dunaway admitted committing tax fraud but stated that "but it was always the corporate culture of that's how things had been done before I got there, while I was there. That was how things were done. There was always going around wanting to skirt the IRS." When the IRS had audited the books and tax returns of Wallace Construction, Dunaway stated that it found only a fraction of the personal expenses that had been diverted. Dunaway claimed that it would have been impossible for Polk and McArthur Thames to have discovered the extent of the amount of money being diverted from Wallace Construction to individuals because of the way that the expenses were booked by the company. Isolated examples had been identified frequently, however, in Dunaway's opinion, the "pervasive nature of this activity could not have been discovered during an audit procedure." In his deposition, Dunaway testified that he had not lied to McArthur Thames and that when the accountants had asked him questions, Dunaway

---

[9]Dunaway alleged that the IRS had audited Wallace Construction three times in the twenty years that Dunaway had been with the company.

had told them the answers. However, Dunaway had not given them information unless they specifically had asked for it. He testified that there accounts were set up that he had not wanted McArthur Thames to see, but if they had asked, they could have seen the accounts.

**Brief Company History**

¶33. In 2004, Wallace Construction had one of the worst years in the history of the company. The company lost $3.4 million in that year alone. Wallace sold $9 million in equipment and laid off employees to compensate for the lack of work. When Hurricane Katrina hit in 2005, Wallace Construction engaged in clean-up, recovery work, and bridge construction. As a result, Wallace Construction earned record profits and Wallace received around $30 million in distributions from Wallace Construction. Afterward, Wallace invested approximately $3.5 million with Goldman Sachs and bought property along Black Creek in Lamar County for around $2.5 million. Wallace purchased a trailer park in Columbia for around $800,000 and borrowed close to $4 million to construct a Microtel in Columbia. Wallace also invested in housing development in Stone County and in St. Tammany Parish, Louisiana.

¶34. Wallace Construction earned less than $60 million in revenue in 2009. In 2010, Wallace Construction again engaged in clean-up work for the BP oil spill and profits soared to more than $140 million. However, payments on the oil-spill jobs were not immediate. In an effort to reduce expenses, Wallace Construction hired a consultant in June 2011 who recommended that the company reduce overhead. A large amount of the money from the oil-spill contracts remained unpaid and Wallace Construction had engaged in jobs that were

18

losing money. The Action Frac job lost $1.5 million and Wallace Construction lost around $1 million on the Jackson County Hospital job.

## PROCEDURAL HISTORY

¶35. On January 10, 2013, Wallace Construction filed a complaint, alleging that McArthur Thames negligently audited the company from December 31, 2008, through 2011.[10] The complaint included six counts: (1) auditor negligence; (2) negligence in preparation of income tax returns; (3) breach of fiduciary duty; (4) breach of contract; (5) fraud; and (6) conspiracy to defraud Wallace Construction. Wallace alleged that McArthur Thames owed a duty of care to Wallace Construction, its Board of Directors, and its shareholder to perform each financial statement audit of Wallace Construction in accordance with generally accepted auditing standards ("GAAS") and in accordance with terms set out in each respective engagement letter.

¶36. Wallace Construction alleged that McArthur Thames had breached its duty by failing to discover that corporate assets of Wallace Construction had been misappropriated and by failing to audit, in accordance with GAAS, purchases made using company credit cards. It alleged that personal expenditures had been paid for by Wallace Construction and had been charged to jobs performed. Wallace Construction alleged that McArthur Thames had failed to notify its board of directors of this misconduct, which lead to widespread abuse of

[10]The trial court added Wallace's wife as a plaintiff and dismissed Polk as an individual defendant.

19

corporate funds for personal benefit and to the eventual downfall of the company.[11] Specifically, Wallace Construction alleged that, as early as 2007, Polk had been aware that hundred of thousands of dollars in personal expenses had been charged to "other job costs."

¶37.    Wallace Construction's net worth had been materially overstated on the audited financial statements of Wallace Construction. According to the balance sheet audited by McArthur Thames, for the year ending December 31, 2011, Wallace Construction's stockholder's equity exceeded $7 million. Wallace Construction had an actual net worth of between $300,000 and $400,000. Because of McArthur Thames's overstatements, Wallace Construction did not have any notice that it lacked the ability to continue as a going concern and, as of December 31, 2011, did not meet the definition of a going concern. Thus, McArthur Thames also breached its duty to disclose that the company was not a going concern.

¶38.    The complaint also alleged that McArthur Thames's failures had resulted in $4,000,000 of unrecorded and undetected payables owed by Wallace Construction to subcontractors during the 2010 audit, which led to Wallace Construction's liabilities being understated by $4,000,000 as of December 31, 2010. The complaint alleged that the Board of Directors, including Wallace, had made detrimental financial decisions based on the financial statements provided by McArthur Thames such as paying executive bonuses and taking out distributions from the company. Had Wallace known about the company's need

_____

[11]Raymond Polk originally was named individually as a defendant but later was dismissed as a party.

for additional capital, Wallace could have liquidated his investment before June 2012, when it had lost all value.

¶39.    On March 15, 2013, McArthur Thames answered the complaint, admitting that Wallace Construction's corporate assets had been misappropriated and that personal expenditures had been paid for by Wallace Construction but denying the breach of any duty owed to Wallace Construction and claiming that the misconduct had been purposefully hidden from it.

¶40.    On April 12, 2013, McArthur Thames filed a counterclaim against Wallace, Wallace Construction, Dunaway, and Carney. The counterclaim alleged that materially false information had been provided to McArthur Thames, that the firm had been unable to complete the process of preparing tax returns, and that the firm was owed for the value of the services it had rendered for the accounting work in the amount of $47,617. McArthur Thames additionally asserted that Wallace Construction's management had breached its duty to provide true and accurate representations and that the firm through the exercise of reasonable diligence could not have discovered the truth.

¶41.    Discovery included more than fifty depositions and approximately 500,000 pages of documents. Wallace Construction limited the discovery it produced to documents before June 30, 2012, the date of the sale. McArthur Thames objected to the limitation and requested a discovery order from the court. The trial court agreed with Wallace Construction and established a discovery cutoff date of June 30, 2012. The trial court also refused to grant McArthur Thames's request for discovery of the Wallaces' personal checking accounts.

¶42.    To support their claims, Wallace offered Doug Arnold to provide expert testimony on the auditing standard of care, Ralph Summerford to provide expert testimony on causation, and William Dameworth for expert testimony on damages. Using Arinder's adjusted financial statements, Dameworth prepared a projected valuation of the company as of June 30, 2012, had it not been for McArthur Thames's omissions.  Summerford issued opinions on causation and damages, linking the damages Wallace suffered to McArthur Thames. Summerford relied on Dameworth's projected value of the company in issuing his opinions.

¶43.    The trial court, pursuant to Mississippi Rule of Evidence 104(a), appointed JuriLytics, LLC, as a technical advisor to the court.[12] JuriLytics, based out of California, provides courts and attorneys with high-level academic peer review of expert reports. JuriLytics provided two independent reviews of each parties' reports on issues surrounding auditing standards and two independent reviews on issues surrounding causation and damages.

¶44.    McArthur Thames filed its ninth motion for summary judgment asking the trial court to dismiss Wallace Construction's case for failure to support its claims with expert testimony. McArthur Thames moved to exclude Wallace Construction's standard-of-care expert, Doug Arnold, and its two damages experts, Ralph Summerford and William Dameworth.

---

[12]Mississippi Rule of Evidence 104(a) states that "the court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."

22

¶45. The trial court held an evidentiary ***Daubert***[13] hearing on August 17-18, 2015. On August 26, 2015, the trial court entered an order preliminarily finding that Summerford's and Dameworth's opinions on damages and causation were unreliable. The trial court requested Wallace Construction address its concerns as to admissibility.

¶46. On September 14, 2015, the trial court entered an order granting McArthur Thames's motion to exclude Summerford's expert opinion on causation. The trial court found that Summerford's expert opinion had been "based on an inadequate and unreliable methodology and is inadmissible under Rule 702 of the Mississippi Rules of Evidence."[14] Although Wallace Construction had shown proof of McArthur Thames's negligence, the trial court found that Summerford had failed to establish a nexus between McArthur Thames's acts or omissions and the eventual demise of Wallace Construction.

---

[13]***Daubert v. Merrell Dow Pharm., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[14]Mississippi Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

M.R.E. 702.

¶47. On September 16, 2015, the trial court found that Arnold and Dameworth sufficiently had satisfied the court that their opinions were relevant and reliable. The trial court also allowed Summerford's testimony on damages.

¶48. McArthur Thames then renewed its motion for summary judgment for lack of evidence of causation. The trial court granted McArthur Thames's motion and dismissed Wallace Construction's claims, finding that expert testimony on causation was required in malpractice cases and that Wallace Construction's claims therefore were void as a matter of law.

¶49. Wallace Construction now appeals and raises three issues:

a. Whether Mississippi law requires expert testimony on causation in auditing malpractice cases.

b. If not, whether the trial court erred in finding that there was no genuine issue of material fact as to causation and granting summary judgment when Wallace testified that he would have retaken control of the company had McArthur Thames informed him of the significant discrepancies in the company's financials.

c. Whether the trial court erred in excluding Summerford's expert causation testimony.

¶50. McArthur Thames cross-appeals and raises three issues:

a. Whether the trial court erred in failing to dismiss Wallace Construction's complaint as barred by the applicable statute of limitations.

b. Whether the trial court abused its discretion in limiting discovery of Wallace Construction's financial information to June 30, 2012.

c. Whether the trial court erred in refusing to allow discovery of the Wallaces' personal accounts.

## ANALYSIS

¶51.   The four experts relevant to this appeal are: Doug Arnold, William Dameworth, Ralph Summerford, and James Koerber.

Doug Arnold

¶52.   Arnold provided professional opinions with respect to whether or not McArthur Thames had conducted the audits of the financial statements of Wallace Construction in accordance with generally accepted auditing standards ("GAAS") for the years ending December 31, 2007, through December 31, 2011. Arnold concluded that McArthur Thames had not conducted its audits in accordance with GAAS and that each of those years had material misstatements in the financial statements. Arnold stated that many of the issues that had not been reported to Wallace Construction's Board at the conclusion of the 2007 audit impacted subsequent years. Arnold stated that, per GAAS, the auditor's report, and engagement letter, McArthur Thames had been responsible to the Board of Directors of Wallace Construction and not to the management.[15] McArthur Thames failed to comply with GAAS by not communicating material corrected misstatements to the Board and that the Board should have been notified that there were a significant number of audit adjustments which were material (individually and in the aggregate) each and every year from 2007 through 2011.

¶53.   McArthur Thames additionally failed to communicate the fraud that had been occurring in the company. Arnold stated that McArthur Thames had been aware of the fact

---

[15]Thus, even had management reported an item to the board, McArthur Thames's responsibility to also communicate was not alleviated.

that Wallace Construction had been improperly recording personal expenses of individuals in its books and records and had failed to communicate this in writing as GAAS required.

## William Dameworth

¶54.  Dameworth presented financial statements that showed what Wallace Construction's financial condition would have been in 2012 had McArthur Thames told Wallace about the personal expenses being paid for by the company. Dameworth based his opinion on a "significant hypothetical assumption." His "significant hypothetical assumption" was that Wallace had specifically represented that if he had known the extent of what was going on at the company, he would have taken action, which could have included firing people or changing things similar to the action that he took in 2004 and 2005 when the company's revenues had dropped off.

¶55.  His valuation was meant to reflect a continuation from 2007 to 2011 of the trajectory of the company from its start through 2006. Dameworth estimated that, as of June 30, 2012, the fair market value of a one-hundred-percent equity interest in Wallace Construction amounted to $8,400,000. In forming his opinion, Dameworth analyzed the economy, including gross domestic product, the consumer, government spending, and investments. Dameworth additionally analyzed the road and highway construction industry in the United States.

## Ralph Summerford

¶56.  To formulate his opinions, Summerford relied on Arinder's adjusted financial statements, Dameworth's business valuation of Wallace Construction as of June 30, 2012,

and on Arnold's standard of care opinions. To project the lost profits Wallace Construction suffered, he additionally used the actual revenues as adjusted by Arinder from the audited financial statements.

¶57. Summerford first concluded that Wallace Construction had suffered a net economic loss in the form of undistributed lost profits of at least $4,490,000 as a result of the combined actions of McArthur Thames. Summerford relied on Arnold's opinions that McArthur Thames had failed to appropriately perform and communicate its audit work and findings which resulted in losses to Wallace Construction. Summerford calculated the lost profits from the initial date that the Board of Directors should have been made aware by McArthur Thames of the alleged fraud, April 1, 2008, and continued until the date the business was sold, June 30, 2012. Summerford stated that, had McArthur Thames properly performed its duties and notified the board, Wallace would have stepped into the day-to-day operations of Wallace Construction and would have operated the business as he had in the past approximately thirty years.

¶58. Lost profits were determined by calculating the revenue Wallace Construction would have earned minus the cost to produce that revenue, but for the acts or omissions of McArthur Thames. Summerford calculated the actual revenues for Wallace Construction from April 1, 2008, to December 31, 2011, and calculated the expected costs. Wallace Construction had lost its bonding capacity in 2012, negatively impacting its revenues; therefore, Summerford assumed the same level of revenues that Wallace Construction had experienced in 2011. Summerford additionally assumed that Wallace Construction should

27

have been notified of inappropriate accounting entries, personal expenses charged by management, and possible fraud no later than the delivery of McArthur Thames's 2007 audit report, on or before April 1, 2008. Summerford's report stated:

> Wallace maintains without question that he would have stepped back into an active management role at least by April 1, 2008. Wallace was not afforded this opportunity due to the failures of [McArthur Thames] in the performance and communication of its audits and audit findings (as explained by Plaintiffs' expert Doug Arnold, CPA).

> From a financial standpoint, Wallace would have operated [Wallace Construction] as the financial statements for 1998 to 2006 indicate. In my interview with Wallace, he indicated this period accurately captures a full economic cycle of [Wallace Construction's] construction business.

¶59.  Second, Summerford opined that, in addition to lost profits, Wallace had suffered a loss in business value of at least $10,200,000, as a result of the actions of McArthur Thames. He stated that the failures of McArthur Thames, as set out by Arnold, caused the lost business value to Wallace. The lost business value was calculated by the difference in the value of Wallace Construction as of June 30, 2012, and the actual price for which Wallace sold Wallace Construction on June 30, 2012.

¶60.  Summerford valued the total economic damages to Wallace as lost profits of $4,490,000, plus lost business value of $10,200,000, for a total of $14,690,000. Summerford stated that the amount of distributions that Wallace received were approximately equal to reported income. Therefore, Wallace had withdrawn the amount reported on the income statements of the audited financial statements that McArthur Thames had prepared.

<u>James Koerber</u>

28

¶61. James Koerber, an expert for McArthur Thames, reported that Dameworth's significant hypothetical assumption, that Wallace Construction's board of directors was not aware of the misappropriations of corporate assets, was an incorrect assumption. Koerber took issue with the fact that Standards 9 and 10 of the Uniform Standards of Professional Appraisal Practice ("USPAP") do not mention the term "significant hypothetical assumption." Koerber argues that Dameworth's use of a "significant hypothetical assumption," did not comply with USPAP and that his report did not clearly state that the use of a significant hypothetical assumption might have affected the assignment results.

¶62. Koerber asserted that Wallace Construction had no damages and that "any payment of personal expenses for non-shareholders in excess of what Mr. Tommy Wallace approved could be recovered from those non-shareholders by relying on the services of the certified public accounting firm and law firm for Wallace Construction." Koerber's theory was that the damages had been caused by Wallace Construction's management making bad business decisions on bidding jobs. Because McArthur Thames had not advised Wallace Construction on management decisions, the damages could not be attributed to McArthur Thames.

¶63. Koerber additionally disagreed with the calculation of both loss of business value and lost profits separately. Koerber concluded that lost profits must be removed from the loss of business value to avoid double recovery or "double dipping." He stated that because the Dameworth Report did not provide a value of one hundred percent of the equity interest at April 1, 2008, to compare with his June 30, 2012, valuation, it had failed to measure the loss of business value and did not eliminate lost profits from the valuation calculation.

Traditionally, loss of business value is considered for an entity that has been destroyed and is based on the assumption that the loss is permanent. Koerber argued that Wallace Construction had not ceased operations and had not filed for bankruptcy protection; therefore loss of the business calculations did not apply to Wallace Construction.

## I. Standard of Review

¶64. The appropriate standard for appellate review of the trial court's grant of a motion for summary judgment is de novo. *Miss. Dep't of Revenue v. AT&T Corp.*, 202 So. 3d 1207, 1213 (Miss. 2016). This Court uses an abuse of discretion standard for decisions to exclude expert testimony. *Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara*, 908 So. 2d 716, 721 (Miss. 2005).

## II. Whether expert testimony on causation is required in auditing malpractice cases.

¶65. Wallace Construction first argues in its appellant's brief that expert testimony to prove causation is not required in all auditing malpractice cases. McArthur Thames, in its appellee's brief, agrees and states that "Mississippi law does not require expert proof of causation in every case," and that "the fact that this is an auditing malpractice case is not *per se* determinative of whether an expert is required." McArthur Thames instead argues that expert proof of causation is required in this particular case because of the complex nature of the issue. Therefore, because both parties agree that expert testimony is not required to establish causation in every case, the issue becomes whether expert testimony is needed to establish causation under the facts of this case.

## III. Whether expert testimony on causation is required in this case.

¶66. Wallace argues that it presented sufficient and competent summary judgment evidence of causation in the form of lay testimony to avoid summary judgment. Wallace testified that, had McArthur Thames informed the board of the internal theft and fraud during the 2007 audit, he would have come out of retirement to actively manage the company. He stated that this would have included firing those employees who were stealing from him and taking steps to minimize cash distributions and charitable contributions. Wallace's position is that a jury "guided only by common sense and everyday experience" can understand that, had Wallace been made aware of the improper personal expenses, he would have come out of retirement to manage the company and would have fired the people who were stealing from his company.

¶67. McArthur Thames instead argues that expert proof is required in this case because of the complexity of the issues. It takes the position that it is far beyond the common knowledge of lay jurors to understand the link between McArthur Thames's alleged negligence and the lost profits and business value claimed by Wallace Construction and points out that the trial court appointed a technical advisor to assist in this case.

¶68. "Proximate cause is an essential element in an action of negligence that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." **Burnham v. Tabb**, 508 So. 2d 1072, 1074 (Miss. 1987) (citing W. Keeton, *Prosser & Keeton on Torts*, § 41 (5th ed. 1984)). As this Court previously has stated:

> "In order for an act of negligence to proximately cause the [plaintiff's] damage, the fact finder must find that the negligence was both the cause in fact

31

and legal cause of the damage." ***Glover v. Jackson State Univ.***, 968 So. 2d 1267, 1277 (Miss. 2007). To be held liable, a defendant's negligence "need not be the sole cause of an injury," ***Foster v. Bass***, 575 So. 2d 967, 992 (Miss. 1990), but the defendant's negligence must be a "substantial factor in producing the injury." ***New Orleans & N.E.R. Co. v. Burge***, 2 So. 2d 825, 826 (Miss. 1941) (citations omitted).

***Travelers Cas. & Sur. Co. of America v. Ernst & Young LLP***, 542 F. 3d 475 (5th Cir. 2008). "The general rule in Mississippi is that expert testimony is not required where the facts surrounding the alleged negligence are easily comprehensible to a jury." ***Wal-Mart Stores, Inc. v. Johnson***, 807 So. 2d 382, 388 (Miss. 2001) (citing ***Hammond v. Grissom***, 470 So. 2d 1049, 1052 (Miss. 1985)).

¶69. The trial court assumed that there was sufficient proof that a jury reasonably could find that McArthur Thames had been negligent in performing audits from 2007 through 2011. Although the trial court considered Wallace's knowledge, or lack thereof, contested and questionable, the trial court also stated that there was a sufficient basis in the court record for a jury to find that Wallace was generally unaware of the financial condition of his company in 2008 and that Wallace's ignorance could be attributable to McArthur Thames. The trial court was not troubled with the question of whether Wallace would have returned to manage the company but instead with the historical performance of Wallace Construction and the reasonableness of projecting the trends into the future.[16] It stated: "[P]laintiffs offered the testimony of Mr. Wallace to establish causation. Mr. Wallace, who admittedly knows nothing of accounting or auditing, could only speculate as to what he would have done if the

---

[16]The trial court stated that "whether or not Mr. Wallace would have returned to manage the company is a fact that can be determined by a layperson."

Defendant's alleged negligence had not occurred." The trial court then dismissed the case, finding that malpractice cases required expert testimony to establish causation.

¶70.    As previously established, expert testimony is not an absolute requirement to establish causation in all malpractice cases. Wallace contends that his own testimony was sufficient to establish causation in this case. Wallace cites *Travelers*, in which Ernst & Young ("E&Y") had issued an unqualified audit opinion letter that estimated a projected loss of $60 million for one of Friede Goldman Halter's ("FGH") projects, Petrodrill. *Travelers*, 542 F. 3d at 479. Travelers, a surety company, had voiced concerns about Petrodrill before issuing $70 million in surety bonds but was assured that E&Y's projected loss for Petrodrill remained accurate. *Id.* at 480. Six months after issuing the surety bond, FGH released new loss estimates that anticipated a loss of $121 million for Petrodrill. *Id.* FGH filed for bankruptcy shortly afterward and Travelers was required to pay out $58 million to fulfill its obligation as surety. *Id.* at 481. The jury found that E&Y had been negligent in conducting its audit and that its negligence had proximately caused twenty-five percent of Travelers' harm. *Id.* E&Y appealed, arguing that "the evidence was insufficient for a rational jury to find that its negligent audit proximately caused Travelers financial harm . . . ." *Id.* at 485. The Fifth Circuit Court of Appeals found:

> Travelers' underwriters testified that had they known that no reasonable loss estimate could be generated for Petrodrill (i.e., absent E&Y's negligence), they would not have issued the Pasha bond, even taking into account the positive developments from FGH's liquidity campaign. The jury was free to believe this testimony and thus reasonably conclude that E&Y's negligent audit was a cause in fact of Travelers' decision to issue the bond.

*Id.* at 486–87.

33

¶71. Similarly, in *Wirtz*, this Court stated that, regarding standard of care, proof that the accountant "did not exercise that knowledge, skill, or ability must come from expert testimony." However, when considering causation, the Court did not mention expert testimony but found that "reasonable jurors could have believed that the $15,000.00 charged to the Estate was a direct and proximate result of negligence by Switzer." *Wirtz v. Switzer*, 586 So. 2d 775, 781 (Miss. 1991), *abrogated by* **Upchurch Plumbing, Inc. v. Greenwood Utils. Comm'n**, 964 So. 2d 1100 (Miss. 2007).

¶72. As in *Travelers* and *Wirtz*, here the jury reasonably could have concluded that McArthur Thames's inaccurate financial audits were a cause in fact of Wallace Construction's diminished business value, based on Wallace's lay testimony. While this case does contain highly technical issues for which expert testimony is required, we find that the average juror could understand the link between breach and damages based on Wallace's testimony alone. Wallace successfully had managed his construction company for more than thirty years, and the trial court recognized that whether or not Wallace would have returned to manage the company was a question of fact for the jury. Wallace testified that, had McArthur Thames informed him of the true status of his company, he could have liquidated assets earlier, instead of attempting to save the company and failing in 2012 when the damage was too much to control. He testified that he would not have given $1 million to foreign ministries and would not have paid bonuses to executive staff members if he had known that the company had lacked the funds to support them. In other words, had McArthur Thames's financial statements been accurate or had it informed Wallace of the alleged fraud

34

that was occurring in his company, Wallace would have come out of retirement and made different decisions that would have affected the value of Wallace Construction.

¶73.    An independent auditor is "a person engaged to review and examine a company's financial statements and then to issue an opinion with respect to the fairness of that presentation." 1 Am. Jur. 2d *Accountants* § 1 (1994). McArthur Thames's engagement letter to Wallace Construction stated:

> We will audit the balance sheet of T. L. Wallace Construction, Inc. as of December 31, 2008, and the related statements of changes in stockholders' equity, earnings, and comprehensive income, and cash flows for the year then ended.
>
> The objective of our audit is the expression of an opinion about whether your financial statements are fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America.
>
> . . . .
>
> Also, we will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from errors, fraudulent financial reporting, misappropriation of assets, or violations of laws or governmental regulations that are attributable to the entity or to acts by management or employees on behalf of the entity.

Thus, McArthur Thames contracted to accurately audit the financial statements of Wallace's company and to assure Wallace that the financial statements were free of material misstatements. Wallace Construction's financial statements failed to accurately represent the company's financial picture. It is logical, and within the comprehension of a lay jury, to conclude that, had McArthur Thames presented Wallace with correct financial statements, he would have made better business decisions and would have run the company as he had in the past. This question of material fact is enough to defeat summary judgment.

¶74. Common sense and everyday experience would allow the jury to understand that, had Wallace been made aware of hundreds of thousands of dollars of improper personal expenditures plus the creation of artificial accounts receivable, underreporting of accounts payable, and the shifting of job costs, he would have fired those responsible and would have managed the company himself. "Summary judgment should be granted with great caution." *Simpson v. Boyd*, 800 So. 2d 1047, 1050 (Miss. 2004). To avoid summary judgment, Wallace Construction must have shown only that a genuine issue of material fact exists. The trial court stated that Wallace Construction had offered the "testimony of Mr. Wallace to establish causation. Mr. Wallace, who admittedly knows nothing of accounting or auditing, could only speculate as to what he would have done if the Defendant's alleged negligence had not occurred." Yet, who better to testify as to what he would have done differently with his own company than the person who had successfully managed the multimillion dollar company for more than thirty years.

¶75. Whether McArthur Thames's actions damaged the company is a question within the providence of a jury. Accordingly, because Wallace's testimony established a genuine issue of material fact exists as to causation, we reverse the trial court's grant of summary judgment.

> **IV. Whether the trial court erred in excluding Summerford's causation opinion.**

¶76. Wallace next argues that, although expert testimony was not necessary to establish causation, the trial court erred in excluding Summerford's causation opinion. The trial court has sound discretion in the admission of expert testimony. *Extension of Boundaries of City*

*of Tupelo v. City of Tupelo*, 94 So. 3d 256, 267 (Miss 2012). This Court will not reverse the decision of the trial judge unless that decision "was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Mississippi Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003).

¶77. Mississippi Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

M.R.E. 702. This Court applies the federal standard established in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), to the admissibility of expert testimony pursuant to Rule 702. *Hubbard ex rel. Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 675 (Miss. 2010). The focus of a *Daubert* analysis "must be solely on principles and methodology, not on the conclusions they generate." *Mississippi Transp. Comm'n*, 863 So. 2d 36-37 (quoting *Daubert*, 509 U.S. at 595).

¶78. During the *Daubert* hearing, the trial court repeatedly asked for the methods Summerford had employed to determine his causation theory. Summerford stated that his team had spent more than 3,400 hours working on the case and analyzing the data. Summerford testified that he personally had spent more than 500 hours reviewing his staff's work and that he had years of experience on identifying causation. However, the trial court

was not satisfied and held that Summerford's testimony would not assist a jury in deciding whether Wallace could have saved the company.

¶79. In its order granting summary judgment, the trial court stated that Summerford had not allayed its concerns about the methodological basis that supported his opinions on causation. The trial court found issue with Summerford's failure to outline any general management strategies used by Wallace in the past and to demonstrate that those strategies would have been effective in the 2007-2011 Great Recession period. Summerford based his causation opinion on Wallace's sworn testimony to establish the link between McArthur Thames's breaches and the resulting damage to the company, concerning which the trial court stated:

> In Mr. Summerford's report, he simply offers the conclusion that "Wallace would have operated [Wallace Construction] as the financial statements for 1998 to 2006 indicate. With regard to this opinion, the Court cannot evaluate the methodology used to arrive at this opinion because no methodology was used at all." (Footnote omitted.)

¶80. The trial court has sound discretion in the admission of expert testimony and is vested with a "gatekeeping responsibility." *Mississippi Transp. Comm'n*, 863 So. 2d at 36. "A trial judge's determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion." *Denham v. Holmes ex rel. Holmes*, 60 So. 3d 773, 783-84 (Miss. 2011) (quoting *Worthy v. McNair*, 37 So. 3d 609, 614 (Miss. 2011)) (citation omitted).

¶81. In its discretion, the trial court found that, without more, Summerford's causation opinion was speculative and lacked reliable methodology. The trial court carefully considered

the peer review reports, Wallace's response to the peer review reports, the testimony in the *Daubert* hearing, and the deposition testimony and expert report of Summerford, and all of the *Daubert*-related motions in its decision to exclude Summerford's expert testimony on causation. Because the trial judge thoroughly considered Summerford's expert opinion on causation and found the opinion to be unreliable, it cannot be said that trial court clearly abused its discretion in its decision. Therefore, we decline to reverse the trial court's decision to exclude Summerford's expert causation opinion.

## CROSS APPEAL

**V.     Whether the trial court erred in denying summary judgment based on the statute of limitations.**

¶82.    Because we find that the trial court erred in granting summary judgment, we now address McArthur Thames's three issues on cross-appeal. McArthur Thames first argues that the trial court erred in the denial of its motion for summary judgment based on the statute of limitations. As previously stated, this Court reviews the denial of a motion for summary judgment de novo. *Ridgway Lane & Assocs., Inc. v. Watson*, 189 So. 3d 626, 628 (Miss. 2016), *reh'g denied* (May 12, 2016).

¶83.    Mississippi Code Section 15-1-49 provides:

(1) All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after.

(2) In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.

Miss. Code Ann. § 15-1-49 (Rev. 2012). When there is a genuine dispute, discovery of an injury is an issue of fact for the jury. ***Ridgway Lane & Assoc.***, 189 So. 3d at 629 (citations omitted); *see also **Smith v. Sneed***, 638 So. 2d 1252 (Miss. 1994).

¶84.   McArthur Thames contends that Wallace Construction failed to set forth sufficient facts to take advantage of the discovery rule. Wallace filed the complaint on January 10, 2013, alleging that, although the damages began upon receipt of its 2007 audit – April 2008 – Wallace had not discovered the negligent auditing until 2012, when he was informed that his company was out of money. McArthur Thames argues that Wallace had failed to inquire or confirm that the expenses had been properly charged in the company's records and that, had Wallace made a simple inquiry into how the personal expenses were being booked, he would have discovered that his accounting staff had been recording expenses incorrectly.

¶85.   "[T]his Court has applied the discovery exception where the plaintiff will be precluded from discovering harm or injury because of the secretive or inherently undiscoverable nature of the wrongdoing in question. . . . Or, the discovery exception may be applied when it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act." ***Donald v. Amoco Prod. Co.***, 735 So. 2d 161, 168 (Miss. 1999) (citing ***Staheli v. Smith***, 548 So. 2d 1299, 1303 (Miss. 1989); ***Smith v. Sneed***, 638 So. 2d 1252, 1257 (Miss. 1994)). Wallace repeatedly testified that he had not known that McArthur Thames's audits had been negligently performed until his company had run short on cash in the spring of 2012. Wallace stated that he had trusted the people that he had employed, including Dunaway, and that he never thought that his employees would steal from him. We agree with

40

the trial court's reasoning that Wallace had trusted the members of his Board, that they had been his close friends and his fellow church members, and that he had expected them to run his company in an honorable and aboveboard way.

¶86. In addition, even had the bookkeeping staff shown Wallace the company ledgers, a lay person without accounting experience likely still would not have been put on notice that McArthur Thames's audit had been inaccurate and that personal expenses had been inappropriately recorded in the accounting system. Wallace had a fifth-grade education and could not reasonably be expected to ask his accounting staff if they had been recording his employees' personal expenses correctly. McArthur Thames had issued unqualified audit reports each year that the company's financial statements fairly presented the financial position of the company. Requiring Wallace to hire a second accounting firm to ensure his first accounting firm had been performing its audits correctly would be illogical.

¶87. McArthur Thames next contends that Wallace should have questioned Dunaway's loyalty after Dunaway had signed the Palm Plaza purchase. On October 23, 2006, Dunaway had signed the Palm Plaza purchase agreement on behalf of Wallace Construction. Wallace Construction was to construct the infrastructure of Palm Plaza subdivision and then purchase the lots in the subdivision from Palm Plaza. Palm Plaza filed a lawsuit in 2009 against Wallace Construction for specific performance of the contract and for damages. Wallace Construction argued that, under Louisiana law, an agent is required to have written authority to execute a contract pertaining to immovable property and that Dunaway had no such written authority when he signed the contract on Wallace Construction's behalf. Wallace

41

Construction stated in its memorandum that "T.L. Wallace's board of directors did not, either orally or in writing, pass a resolution authorizing Mr. Dunaway to sign the Purchase Agreement or any other agreement that required T.L. Wallace to purchase all of the Lots."

¶88.　McArthur Thames argues that, at that point, Wallace should have "at least questioned and investigated Dunaway's loyalty and fidelity." We disagree. First, alleging that Dunaway had no authority to sign a purchase agreement and launching an investigation to see if he had been committing accounting fraud is a large leap. Second, had Wallace instigated an investigation after the 2009 lawsuit, he likely would not have discovered McArthur Thames's negligent audits until 2010. Wallace filed the instant lawsuit on January 10, 2013. Thus, the instant lawsuit likely would have been timely regardless.

¶89.　Wallace additionally argues that, even if its claims based on the 2007 and 2008 audits were untimely, its claims still exist for the 2009, 2010, and 2011 audits. McArthur Thames argues that Wallace Construction failed to make this argument to the trial court and that Wallace Construction cannot now break down its lawsuit into multiple claims. Even so, Wallace Construction has provided sufficient evidence to preclude summary judgment on this issue.

¶90.　Wallace has testified that he had relied on McArthur Thames's audits and that he had not discovered that the audits had been negligent until 2012. Because genuine issues of material fact exist as to when the negligent accounting practices should have been discovered, we find that the trial court did not abuse its discretion in denying McArthur Thames's motion for summary judgment on this issue.

**VI.** **Whether the trial court abused its discretion in limiting discovery of company financial information to June 30, 2012.**

¶91. McArthur Thames next argues that the trial court's ruling to limit discovery of Wallace Construction financial documents after July 1, 2012, deprived it of necessary information to dispute Wallace Construction's liability and damages claims. It claims that the post-sale information is relevant and that the trial court abused its discretion in denying discovery of that information.

¶92. Trial courts have considerable discretion in discovery matters and reviews of those decisions are conducted under an abuse-of-discretion standard. *Salts v. Gulf Nat'l Life Ins. Co.*, 872 So. 2d 667, 670 (Miss. 2004). "This Court will affirm a trial court's decision unless there is a 'definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors.'" *Pierce v. Heritage Props., Inc.*, 688 So. 2d 1385, 1388 (Miss. 1997) (quoting *Cooper v. State Farm Fire & Cas. Co.*, 568 So. 2d 687, 692 (Miss. 1990)).

¶93. McArthur Thames requested that the trial court "enter an Order declaring that Plaintiffs produce all relevant current financial information for T.L. Wallace Construction, Inc., through today and up through the date of trial, including but not limited to, any and all financial books and records of the company, financial statements, profit and loss reports as well as all information relating to any Nicholson & Company audit of T.L. Wallace Construction, Inc." The trial court ordered that "discovery in this matter shall be limited to information concerning dates before the date of the sale of T.L. Wallace Construction, Inc. However, to the extent that investigations, audits, reviews, etc. began before the date of sale

43

and extended past the date of sale, discovery concerning those items may be had through December 31, 2012."

¶94. "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the issues raised by the claims or defenses of any party." Miss. R. Civ. P. 26(b)(1). Evidence is not required to be admissible to be discoverable, only relevant. ***Scott by and through Scott v. Flynt***, 704 So. 2d 998, 1004 (Miss. 1996). We find that the trial court erred in its decision to limit discovery to the date of the sale of the company. McArthur Thames seeks the post-sale information in order to rebut Wallace's allegations that rely on the purported sales price and pre-sale financial records. Post-sale financial data is relevant to the issues raised by the claims. Wallace's lost business value damages are based on the contention that the company was "dead" and had a negative $1,800,000 sales price. McArthur Thames should have reasonable access to the financial information of the company after the sale to defend those claims adequately.

¶95. McArthur Thames's discovery request for "all relevant current financial information for T.L. Wallace Construction, Inc., through today and up through the date of trial" is overly burdensome. However, reasonable access to financial information after June 30, 2012, would allow McArthur Thames to rebut Wallace's contention that the purchasers brought the company back to life. Thus, we reverse the trial court's decision to deny disclosure of financial information after the date of the sale.

> **VII. Whether the trial court erred in refusing discovery of Wallace's personal accounts.**

44

¶96. McArthur Thames lastly argues that refusing discovery of Wallace's personal accounts deprived it of necessary information to dispute Wallace's claims based on the Wallaces' financial condition. McArthur Thames filed a motion to compel production of the Wallaces' personal checking account records. In an October 11, 2014, order, the trial court denied McArthur Thames's request to compel discovery of the Wallaces' personal checking accounts, stating that it "finds that the motion to compel and supplemental motion to compel, if granted, would threaten to extend discovery past the deadline in the Court's Third Amended Scheduling Order."

¶97. Where "important information is denied a litigant reversal will obtain." ***Dawkins v. Redd Pest Control Co., Inc.***, 607 So. 2d 1232 (Miss. 1992). This Court stated:

> [A] trial court's discretion in the discovery area is generally guided by the principles that (a) the court follow the general policy that discovery be encouraged, (b) limitations on discovery should be respected but not extended, (c) while the exercise of discretion depends on the parties' factual showings disputed facts should be construed in favor or discovery, and (d) while the importance of the information must be weighed against the hardships and cost of production and its availability through other means, it is preferable for the court to impose partial limitations on discovery rather than an outright denial. Any record which indicates a failure to give adequate consideration to these concepts is subject to the attack of abuse of discretion, regardless of the fact that the order shows no such abuse on its face.

***Id.*** at 1236 (quoting 23 Am Jur 2d, *Depositions and Discovery* § 5 (1983)) (citations omitted). The Wallaces repeatedly testified that, as a result of McArthur Thames's actions, they were "completely broke," that they "lost everything," and that they no longer had any money. Wallace also testified that he could not have provided the necessary funds to save his company and that there had been no way he could have saved Wallace Construction without

45

help. Because the Wallaces repeatedly testified that McArthur Thames's actions caused them to become "broke," they put those claims at issue. Accordingly, the trial judge erred in denying McArthur Thames's motion to compel production of the Wallaces' personal checking account records.

¶98. Wallace argues that, at that time, the case had been pending for almost two years and that all experts had been disclosed and deposed already. The trial had been scheduled to begin February 9, 2015, and discovery was set to close on October 15, 2014, Wallace claims that requiring the Wallaces to gather and produce all of their personal checking account information would have resulted in an extension of the discovery period and a request for a trial continuance. Because there is now no set trial date, extending discovery for a reasonable amount of time no longer will impact those prior discovery deadlines.

¶99. Because the Wallaces testified extensively that McArthur Thames caused them to become completely "broke" and to lose everything, they put those claims at issue. Accordingly, we find that the trial court abused its discretion in denying discovery of the Wallaces' personal accounts.

<u>**CONCLUSION**</u>

¶100. In conclusion, we find that expert testimony is not required to establish causation in this case. Wallace's testimony that, had McArthur Thames informed him of the alleged fraud and of the true value of his company, he would have come out of retirement to manage the company and would have made different financial decisions is sufficient to establish questions of material fact as to causation and to defeat summary judgment. However, the trial

judge did not abuse his discretion in excluding Summerford's expert testimony on causation. Therefore, this Court reverses the trial court's grant of summary judgment in favor of McArthur Thames for lack of causation and remands this case for further proceedings consistent with this opinion. We affirm the trial court's decision to exclude Summerford's expert testimony on causation.

¶101. Additionally, the trial court did not err in denying summary judgment based on the statute of limitations. However, we find that the trial court abused its discretion in its decision to limit discovery of company financial records after July 1, 2012. The trial court also abused its discretion in denying McArthur Thames's motion to compel discovery of the Wallaces' personal checking accounts. Thus, we affirm the trial court's decision to deny summary judgment regarding the statute of limitations. We reverse both the trial court's decision to limit discovery of company financial records after the date of sale and the trial court's decision to deny McArthur Thames's motion to compel discovery of the Wallaces' personal checking accounts and remand this case to the trial court for proceedings consistent with this opinion.

¶102. **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED IN PART AND REMANDED. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., KITCHENS, COLEMAN, MAXWELL AND CHAMBERLIN, JJ., CONCUR. RANDOLPH, P.J., AND BEAM, J., NOT PARTICIPATING.**